DECISION.
{¶ 1} Defendant-Appellant Jonathan Seay challenges the trial court's denial of his motion to suppress. Seay asserts that the police improperly searched a vehicle incident to his arrest, which led to the discovery of cocaine. He also challenges the subsequent trial. Seay claims that the court should have declared a mistrial after a juror communicated with a witness during a break. He further maintains that the prosecutor prejudiced his right to a fair trial through inappropriate remarks made during closing argument. Finally, Seay challenges what, in his view, were erroneous evidentiary rulings by the trial court, maintains that there was insufficient evidence, as a matter of law, to convict him of possession of and trafficking in cocaine, and that the convictions were against the manifest weight of the evidence.
 {¶ 2} Because Seay had no reasonable expectation of privacy in a car he denied owning or possessing, he could not challenge the search of the vehicle. Furthermore, Seay's right to a fair trial was not prejudiced because the juror who communicated with the witness was excused. The testimony before the jury, exclusive of the improper remarks by the prosecutor, was more than sufficient to find him guilty of possession of and trafficking in cocaine. Finally, we do not find merit in Seay's contentions that the trial court made erroneous evidentiary rulings or that the evidence was insufficient to convict him or weighed against the conviction. For these reasons, the judgment of the trial court is affirmed.
 I. Whose Car is it Anyway? {¶ 3} On July 9, 2004, around 4:10 p.m., four plainclothes Cincinnati police officers were in an unmarked vehicle near the Tompkins Apartments. The officers were not responding to any specific complaint from that day, but they had previously made arrests for drug trafficking and criminal trespass at the Tompkins Apartments.
 {¶ 4} One of the officers, Mark Bode, saw Seay exit from a 1994 Dodge Intrepid and approach a white Cadillac in the Tompkins Apartments' parking lot. Another officer, Brian Beechler, believed that Seay had open arrest warrants. Because of this information and the officers' belief that Seay was criminally trespassing, they stopped and detained Seay. Officer Beechler then used his radio to confirm the open warrants.
 {¶ 5} During a search incident to the arrest, keys to a car were found in Seay's pockets. The keys were for the Intrepid that Officer Bode had seen Seay leaving. The police also found $805 in currency, all in small denominations.
 {¶ 6} Officer Elijah Orth stated that Seay then admitted that the Intrepid was his car. There was some confusion about this, because the incident report contained information that Seay had immediately denied owning the car. Nonetheless, the officers, acting under Cincinnati Police policy that called for the towing of a vehicle incident to a driver's arrest, searched and inventoried the vehicle.
 {¶ 7} In plain view between the driver's seat and the center console was a digital scale. A further search of the car revealed a small bag of marijuana in the center console — which Officer Orth maintained that Seay freely admitted belonged to him. After officers saw another plastic bag with crack cocaine in it, Officer Orth said that Seay changed his story and denied any knowledge of this bag and further claimed that he did not own the Intrepid. The police recovered approximately 11.5 grams of cocaine and .8 grams of marijuana. Officer Orth estimated the street value of the cocaine to be just over $1,100. Neither the car nor the baggies of narcotics were dusted for fingerprints.
 {¶ 8} More investigation revealed that the Intrepid was bought only hours before Seay's arrest by Willard Stargel, an 18-year-old acquaintance of Seay. When Officer Bode called Stargel to ask about the car, Stargel stated that Seay had permission to drive the car. This story changed when Seay and Stargel testified at the suppression hearing and the subsequent trial.
 II. He Said, She Said {¶ 9} Seay and his witnesses gave quite different accounts of who owned the Intrepid, why it was at the Tompkins Apartments, and why Seay was in the parking lot. Seay maintained that he spent the night at a friend's house on July 8 and went to Larry Smith's apartment at the Tompkins complex the next morning. As Seay took the trash out for Smith, he found a key to an Intrepid in the alley leading to the parking lot. Seay testified that when he picked the key up, he knew it was Stargel's. Seay then approached a white Cadillac with Lawrence Sims in the driver's seat. As he talked to Sims, Seay said, police officers grabbed him, searched him, and determined that he had open warrants.
 {¶ 10} Seay stated that he never acknowledged that the marijuana was his or that the Intrepid belonged to him. Instead, Seay recalled telling the police that the car belonged to Willard Stargel. And despite the fact that Stargel had just purchased the car four hours prior to the arrest, Seay stated that he knew when he picked up the key that it had to be Stargel's. Seay further maintained that the $805 in cash was money he had collected for an acquaintance's bond.
 III. Stargel Doesn't Hit a Home Run with his Testimony {¶ 11} Stargel stated that he bought the Intrepid from Austin Autos for $1,600 in the early afternoon on July 9. He did not test-drive the car, but he promptly went to the Ohio Bureau of Motor Vehicles to get temporary tags. The receipt for those tags bore a time stamp of 2:09 p.m. After buying the tags, Stargel testified, the car began to perform sluggishly, so he turned into the Tompkins Apartments' parking lot and walked the remaining one-and-a-half miles to his home. When he arrived at home, Seay had called to say that he had found keys to an Intrepid and wanted to know if the keys belonged to Stargel. An hour later, when the police called Stargel about the car, he denied any knowledge about how the marijuana, the crack cocaine, or the digital scale had found its way into the car.
 {¶ 12} We find it odd that Stargel bought his first car without test-driving it, parked it at an apartment complex only a mile-and-a-half away from his house, and almost immediately lost the keys to his car. It was extremely fortunate that an acquaintance of Stargel was able to find the keys so quickly.
 {¶ 13} The taped conversation between Stargel and Officer Bode was also confusing, because Stargel stated that Seay had permission to use the car. Yet in court, Stargel testified about losing his keys and stated that he had only used the word permission because Seay had possession of the keys.
 IV. Try to Get on the Same Page {¶ 14} Larry Smith, the resident Seay visited at the Tompkins Apartments, testified that he had picked Seay up at Seay's mother's house around 10:00 a.m. Smith stated that he and Seay had played video games and eaten lunch together for about four to five hours on July 9. Then Smith's fiancée asked Seay to take out the trash, and when he did not return, Smith noticed that the police had Seay in custody in the parking lot.
 {¶ 15} The problem with Smith's testimony began when he discussed how Seay had come into possession of Stargel's keys. Smith maintained that the car was bought the night before, on July 8, from an individual, not a car dealer. Furthermore, Smith believed that Stargel had lost the keys on July 8, because he testified that Stargel had asked him if he had seen any keys lying around.
 {¶ 16} While this story is fascinating, Smith failed as a witness to corroborate any of Seay's evidence. First, the receipt for the car was marked for July 9, not July 8. There could not have been a discussion about a lost key the night before the car was purchased. Second, there was a discrepancy about whether the car was bought from an individual or a dealer. Third, in Seay's version of the facts, he made his way to Smith's from a girlfriend's residence. In Smith's version, he picked Seay up at Seay's mother's house. These variances could only have damaged the credibility of Seay's witnesses in the eyes of the jury.
 V. Motion to Suppress {¶ 17} Appellate review of a suppression ruling involves mixed questions of law and fact.[1] When ruling on a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight of the evidence.[2] An appellate court must accept the trial court's findings of fact if they are supported by competent and credible evidence.[3] But the appellate court must then determine, without any deference to the trial court, whether the facts satisfy the applicable legal standard.[4]
 VI. Expectation of Privacy {¶ 18} Seay's first assignment of error challenges the trial court's denial of his motion to suppress. He contends that the evidence seized in this case was obtained through an illegal search, outside the scope of a search incident to his arrest. The state responds by arguing that Seay had no expectation of privacy in the car, nor did the police act improperly by conducting an inventory search of the car.
 {¶ 19} The Supreme Court has held that Fourth Amendment rights are personal rights that may not be vicariously asserted.[5] The theory is that a person harmed by the introduction of evidence through an illegal search and seizure of a third person's premises or property has not had any Fourth Amendment rights infringed.[6] Following this rationale, the exclusionary rule is only intended to protect defendants whose Fourth Amendment rights have been violated.[7]
 {¶ 20} In the case of an automobile, a person needs to claim either a property or a possessory interest in the vehicle to be afforded any Fourth Amendment rights in the car.[8] In Rakas v. Illinois, the defendants were passengers in an automobile that had been lawfully stopped on reasonable suspicion but unlawfully searched.[9] The search uncovered a sawed-off rifle under the passenger seat and a box of shells in a locked glove box that helped to link the defendants to a robbery.[10] The defendants never asserted a property interest in the vehicle but claimed standing because of their lawful presence in it as passengers.[11] The Court held that when a person asserts neither a property nor a possessory interest in an automobile searched, an interest in the property seized, or any legitimate expectation of privacy in the area where he has merely been a passenger, the person is not entitled to challenge the search.[12]
 {¶ 21} But the Ohio Supreme Court has recognized that a driver of an automobile who demonstrates that he has the owner's permission to use the vehicle has a reasonable expectation of privacy in the vehicle and standing to challenge its stop and search.[13] Neither standard advances Seay's challenge to the search of the Intrepid.
 {¶ 22} During the suppression hearing, Seay testified that he never told the police that the Intrepid was his car. Instead, he said that Stargel owned the vehicle. Because of Seay's failure to claim any possessory or property interest in the vehicle, it naturally follows that he had no expectation of privacy in the Intrepid. Thus, Seay's Fourth Amendment rights were not violated when the police subsequently searched the vehicle. For these reasons, Seay's first assignment of error is overruled.
 VII. Inventory Search {¶ 23} Before moving on to the next assignment of error, we briefly take note of the state's argument that there was a proper inventory search under the Fourth Amendment. The inventory search here might be subject to question, but we need not reach that issue because Seay could not challenge the search of the Intrepid when he had no reasonable expectation of privacy in the vehicle.
 VIII. Juror Communication with Witnesses {¶ 24} Seay's second assignment of error challenges the trial court's decision not to declare a mistrial after a juror communicated with police witnesses during a trial recess. Seay argues that although the communicating juror was examined and subsequently excused, other jurors may have seen or heard about the communication between the juror and the witnesses.
 {¶ 25} When a trial court learns of an improper communication with a juror, it must hold a hearing to determine whether the communication has biased the juror.[14] Any communication between a juror and a witness about the matter pending before the court is presumed prejudicial.[15]
The burden rests heavily upon the government to establish, after notice to the defendant, that such contact with the juror was harmless to the defendant.[16] The Ohio Supreme Court has noted, however, that the Sixth Circuit has held that the defense must prove that the juror has been biased.[17] Nonetheless, in cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contacts and determining whether to declare a mistrial or to replace an affected juror.[18]
 {¶ 26} In this case, the court acted properly in examining both the communicating juror and the juror who witnessed the communication. The topic of the discussion, the Ohio concealed-carry law, was unrelated to the matter before the court. Furthermore, Seay's trial counsel only objected to the communicating juror remaining on the jury. This concern was addressed with the juror's removal. Now on appeal, Seay urges us to reverse because the entire jury could have been tainted and the trial court did not sua sponte declare a mistrial.
 {¶ 27} Seay's second assignment of error is without merit. Because the trial court properly examined the jurors at issue and the communication was unrelated to the case, there was no prejudicial error in only removing the communicating juror.
 IX. Denial of Due Process Because of Prosecutorial Misstatements {¶ 28} The issue in Seay's third assignment of error is whether the prosecutor's comments during closing argument constituted prejudicial misconduct sufficient to require the reversal of his conviction. To address this assignment, we must determine (1) whether the prosecutor's conduct was improper, and (2) if so, whether it prejudicially affected Seay's substantial rights.[19]
 {¶ 29} When a defendant fails to object to statements made by a prosecutor during closing argument, the challenge is waived unless there is plain error. In order to prevail in this circumstance, the defendant must demonstrate that the outcome of the trial would clearly have been different but for the prosecutor's improper remarks. And the appellate court must not evaluate the statements in isolation, but in light of the entire closing argument.[20] If improper statements are objected to, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would still have found the defendant guilty.[21]
 {¶ 30} The prosecution is normally entitled to a certain degree of latitude in its concluding remarks.[22] And a prosecutor is at liberty to prosecute with "earnestness and vigor, striking hard blows," but he may not strike foul ones.[23] The prosecution is a servant of the law whose interest is not merely to emerge victorious but to see that justice is done. It is thus a prosecutor's duty during closing argument to avoid efforts to obtain a conviction by going beyond the evidence that is properly before the jury.[24]
 {¶ 31} It is improper for a prosecutor to express a personal belief or opinion about the credibility of a witness or the guilt of the accused.[25] A prosecutor must also avoid insinuations and assertions that are calculated to mislead the jury.[26]
Moreover, the Code of Professional Responsibility provides that a prosecutor is not to allude to matters that are not supported by admissible evidence.[27]
 {¶ 32} Seay challenges four statements made by the prosecutor during closing argument. The first comment was not objected to and is thus reviewed under a plain-error standard. The second, third, and fourth comments were objected to and are thus reviewed under a harmless-error standard.
 {¶ 33} Seay argues that the first comment, "The police officers, on the other hand, were consistent," constituted vouching for the credibility of the state's witness. Although prosecutors should not personally vouch for a witness's credibility, this comment is more appropriately described as argument on the truthfulness and credibility of the witnesses based on their testimony. Thus it was proper.
 {¶ 34} Seay challenges the second comment by arguing that the prosecutor improperly misstated and speculated on evidence by saying that Seay had driven the Intrepid to the apartment complex. But the prosecutor was only reviewing testimony by Officer Bode in making this statement. Whether the testimony of Officer Bode was accurate was a question for the jury. There was no misstatement or speculation concerning the evidence and thus the comment did not constitute error.
 {¶ 35} Seay further argues that the prosecution should not have brought up Officer Orth's testimony before the grand jury. We agree with Seay that commenting on and characterizing grand-jury testimony is improper. But the state is correct to point out that Seay's counsel first broached the topic of the grand jury during his cross-examination of Officer Orth. Since the prosecutor was only attempting to explain why Officer Orth needed to see a recorded recollection, Seay's rights were not prejudicially affected.
 {¶ 36} In the final comment challenged by Seay, the prosecutor branded his defense a "fish story." We have already noted that a prosecutor should not express a personal belief about the credibility of a witness or the guilt of a defendant. But because Seay and witnesses Sims and Stargel provided varying accounts of how the car was bought, whether the keys were lost, and how the keys came into Seay's possession, it was not prejudicial for the prosecution to comment on the conflicting accounts. While using the term "fish story" was inappropriate, we hold that, in the context of the whole argument, the error was harmless.
 {¶ 37} The testimony before the jury, exclusive of the improper remarks by the prosecutor, was more than sufficient to find Seay guilty of possession of and trafficking in cocaine. Therefore, we are not persuaded that his substantial rights were prejudicially affected. Thus, the third assignment of error is overruled.
 X. Cumulative Effect of Erroneous Evidentiary Rulings {¶ 38} Although violations of the Rules of Evidence during trial, viewed singularly, might not rise to the level of prejudicial error, a conviction may be reversed if the cumulative effect of the errors deprived the defendant of his constitutional right to a fair trial.[28]
 {¶ 39} Seay first states that the trial court allowed improper hearsay from Officer Orth when he testified to a police procedure of rotating undercover vehicles. This testimony was not an out-of-court statement by a declarant offered for the truth of the matter asserted.[29] The response from Officer Orth merely affirmed that people on the street became familiar with unmarked police cars. Even if this were hearsay, it certainly did not rise to the level of prejudicial error. We cannot see how Seay was harmed by this innocuous testimony.
 {¶ 40} Seay next claims that an objection to speculative testimony from the officers was improperly overruled. But a review of the record indicates that either all objections relating to speculative testimony on the pages cited by Seay were sustained or that the challenged testimony was given with a proper foundation.
 {¶ 41} Seay also complains that the court made an evidentiary error by overruling an objection to testimony regarding the arrest report presented to the grand jury. But the state is correct in pointing out that Seay first raised the issue of the arrest report being presented to the grand jury. Therefore, it was not prejudicial error for the court to allow the state to broach the subject and to rehabilitate its witness as to recorded recollections.
 {¶ 42} Seay further argues that the trial court should have sustained the objection to the playing of an audiotaped phone call between Stargel and the police. Despite the defense objection, Seay's counsel agreed to play the tape if a proper foundation was later established. No further objection ensued, and thus it was not error for the trial court to allow the tape to be played. Furthermore, Seay did not object to the failure to provide the tape in discovery. Under a plain-error standard, there is no indication that the result of the trial would have been different had the defense been provided the tape in discovery.
 {¶ 43} Finally, Seay contends that the audiotape was improperly used by the prosecution to impeach the state's own witness, Stargel. The Rules of Evidence provide that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.[30] As this court has stated previously, "surprise is a factual issue left to the trial court's sound discretion * * * and may be shown if the witness's trial testimony is materially inconsistent with his prior written or oral statement, and counsel lacked reason to believe that the witness would recant when called to testify."[31] Furthermore, affirmative damage may be demonstrated "when the witness testifies to facts which contradict, deny or harm the party's trial position."[32]
 {¶ 44} In the present case, Stargel's recollection of how the Intrepid came into Seay's possession changed from the night of the arrest to the trial. The prosecution was surprised to hear the change in the testimony and needed to impeach Stargel to avoid harm to its case. Therefore, the trial court did not err by allowing the prosecution to impeach Stargel with the audiotape.
 {¶ 45} We find no merit in Seay's contention that erroneous evidentiary rulings had a cumulative effect that prejudiced his right to a fair trial. In fact, the case was tried virtually free of error. We conclude that Seay received a fair trial and that any errors were harmless or nonprejudicial. Seay's fourth assignment of error is thus without merit.
 XI. Weight and Sufficiency of the Evidence {¶ 46} When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the state and determine whether such evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt.[33]
 {¶ 47} A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror."[34] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[35] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[36]
 {¶ 48} Seay was convicted of possession of and trafficking in cocaine. The possession statute prohibits any person from knowingly obtaining, possessing, or using a controlled substance.[37] The trafficking statute states that no person shall knowingly prepare for distribution or distribute a controlled substance for sale or resale.[38]
 {¶ 49} The state offered evidence that four plainclothes Cincinnati police officers were watching the Tompkins Apartments' parking lot when one of the officers recognized Seay leaving a maroon Intrepid. One of the other officers believed that Seay had warrants out for his arrest. The officers stopped Seay for questioning and confirmed the open warrants. A subsequent search of his person yielded the keys to the Intrepid and $805 in cash.
 {¶ 50} The state further offered evidence that in plain view in the car was a digital scale. The officers, having worked in narcotics, were familiar with this scale as one used by a drug dealer. A search of the vehicle then turned up a bag of marijuana and a bag of cocaine.
 {¶ 51} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Seay had committed the offenses of possession of and trafficking in cocaine. Therefore, the evidence presented was legally sufficient to sustain Seay's convictions.
 {¶ 52} Despite the failure to perform any fingerprint tests on the car or the drugs, police officers testified that they had never previously been successful in obtaining fingerprints from drug bags. Furthermore, one of the officers observed Seay exiting from the Intrepid. While Seay presented a different scenario of events, our review of the record does not persuade us that the jury clearly lost its way and created a manifest miscarriage of justice in finding Seay guilty of possession of and trafficking in cocaine. Therefore, the convictions were not against the manifest weight of the evidence.
 {¶ 53} Accordingly, we overrule Seay's assignments of error and affirm his convictions.
Judgment affirmed.
Hildebrandt, P.J., and Sundermann, J., concur.
[1] See State v. Burnside (2003), 100 Ohio St.3d 152, 2003-Ohio-5372,797 N.E.2d 71, at ¶ 8.
[2] See State v. Fanning (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583.
[3] Burnside, supra, at ¶ 8.
[4] Id., citing State v. McNamara (1997), 124 Ohio App.3d 706,707 N.E.2d 539.
[5] See Rakas v. Illinois (1978), 439 U.S. 128, 134, 99 S.Ct. 421, citing Wong Sun v. United States (1963), 371 U.S. 471, 492, 83 S.Ct. 407.
[6] Id., citing Alderman v. United States (1969), 394 U.S. 165, 174,89 S.Ct. 961.
[7] Id., citing United States v. Calandra (1974), 414 U.S. 338, 347,94 S.Ct. 613.
[8] Rakas, 439 U.S. at 148.
[9] Id. at 130.
[10] Id. at 131.
[11] Id.
[12] Id. at 148-149.
[13] See State v. Carter (1994), 69 Ohio St.3d 57, 62, 1994-Ohio-343,630 N.E.2d 355, citing United States v. Rubio-Rivera (C.A.10, 1990),917 F.2d 1271, 1275.
[14] See State v. Smith (1995), 74 Ohio St.3d 72, 88, 1995-Ohio-171,656 N.E.2d 643, citing Smith v. Phillips (1982), 455 U.S. 209, 215-216,102 S.Ct. 940.
[15] Id.
[16] Id.
[17] Id., citing United States v. Zelinka (C.A.6, 1988), 862 F.2d 92,95.
[18] Id., citing United States v. Daniels (C.A.6, 1976), 528 F.2d 705,709-710.
[19] See State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883.
[20] See State v. Kelly, 1st Dist. No. C-010639, 2002-Ohio-6246, at ¶ 22, citing Crim. R. 52(B) and State v. Keenan (1993), 66 Ohio St.3d 402,410, 613 N.E.2d 203.
[21] See State v. Smith (1984), 14 Ohio St.3d 13, 15, 470 N.E.2d 883.
[22] Id. at 14, citing State v. Woodwards (1966), 6 Ohio St.2d 14, 26,215 N.E.2d 568.
[23] Id., citing Berger v. United States (1935), 295 U.S. 78, 88,55 S.Ct. 629.
[24] Id., citing United States v. Dorr (C.A.5, 1981), 636 F.2d 117.
[25] Id., citing State v. Thayer (1931), 124 Ohio St. 1, 8, 176 N.E. 656; DR 7-106(C)(4).
[26] Id., citing Berger, 295 U.S. at 88, 55 S. Ct. 629.
[27] Id., citing DR 7-106(C)(1).
[28] See State v. DeMarco (1987), 31 Ohio St.3d 191, 196-197,509 N.E.2d 1256.
[29] Evid.R. 801.
[30] Evid.R. 607.
[31] See State v. Jones (Sept. 27, 1995), 1st Dist. No. C-940691, citing State v. Diehl (1981), 67 Ohio St.2d 389, 423 N.E.2d 1112.
[32] Id., citing State v. Stearns (1982), 7 Ohio App.3d 11,454 N.E.2d 139.
[33] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[34] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[35] Id., citing Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211.
[36] Id.
[37] R.C. 2925.11(A).
[38] R.C. 2925.03(A)(2).