DECISION.
{¶ 1} Following a jury trial, defendant-appellant Andrew Bevins was convicted of aggravated burglary and rape. The trial court sentenced him to consecutive ten-year prison terms. Bevins now appeals.
 {¶ 2} Bevins argues that (1) the prosecutor engaged in misconduct; (2) the trial court erred by denying his request to represent himself; (3) the prosecutor and the court violated his rights under Brady v.Maryland[1]; (4) his convictions were against the weight of the evidence and were not supported by sufficient evidence; and (5) his sentences were unconstitutional. In a sixth assignment of error, Bevins' appellate counsel submits for our review several issues that Bevins has requested "without counsel due to difference of opinion on the merit of same."
 The State's Case {¶ 3} After midnight on November 8, 2000, Nina Gipson and her eight-year-old daughter were asleep in Gipson's bed when Gipson was awakened by the creaking of the stairs outside her bedroom door. Gipson jumped out of bed and saw a "shadow peeping around the corner." So Gipson grabbed a glass from a dresser and lunged at the person who had come up the steps.
 {¶ 4} Gipson struck the intruder in the forehead, above his left eye, with the glass. The man turned Gipson around and held her in a headlock and choked her. As Gipson was screaming and struggling, her daughter tried to fight the man.
 {¶ 5} The man continued to choke Gipson and to "fling [her] around." Her daughter was yelling, "[G]et off my momma." The man told Gipson to stop struggling and to have her daughter go into the bedroom, or he would kill Gipson. Gipson testified that her daughter "finally went to the bedroom. Well, after I told her, I said, babe, you have to listen and go and do what the man says or he going to kill mommy."
 {¶ 6} Gipson repeatedly tried to turn on the lights, but the intruder kept turning the light switch off. Gipson grabbed a can of disinfectant spray and tried to spray the man in the face, but the man said, "[H]oney, you going to have to do better than that."
 {¶ 7} The struggle carried Gipson and her assailant into her daughter's bedroom and into a closet where some clothing was hanging. When Gipson's daughter jumped on the man, he threw the little girl against a bedpost, where she hit her back before falling to the floor. Gipson then bit the man on the forearm.
 {¶ 8} The man pulled Gipson back into the hallway, just outside her open bedroom door and in view of her daughter, who was sitting on Gipson's bed. As he choked Gipson, the man digitally penetrated her vagina. The man then pushed Gipson into her daughter's room and began to unbuckle his belt. Gipson bumped the man, and he slipped.
 {¶ 9} Gipson ran out of the apartment, screaming. She ran to the home of Francine Jackson, a neighbor, and called the police.
 {¶ 10} Gipson described her attacker as an African-American man who wore a white T-shirt, blue "work pants," and dark blue flip-flops with white writing and designs on them. She testified that she could not see the man's face because he had been holding her from behind.
 {¶ 11} Gipson testified that "Ms. Bevins" and her children had moved into the adjoining apartment a few weeks before the attack. She had seen Andrew Bevins, but had never spoken to him or allowed him to enter her apartment. In contrast to later testimony by Bevins' son, Gipson said that Bevins had never carried laundry for her.
 {¶ 12} Erica Renee Moore, another neighbor, testified that when she had heard Gipson's screams, she looked out her window. Within a few minutes, she saw Bevins walking swiftly to his car: "If he would have walked any faster, he would have been running." Moore said that Bevins was wearing a "workman's uniform" consisting of a light blue shirt and dark blue pants, and blue Adidas flip-flops "with white" on them. Moore saw Bevins drive off in a gray truck.
 {¶ 13} At about 8:30 that morning, Moore saw Bevins return to his estranged wife's apartment, which adjoined Gipson's apartment. Moore noticed that Bevins was wearing the same clothing and shoes that she had seen earlier, but this time Bevins was also wearing a skull cap that covered his forehead.
 {¶ 14} Ann Renee Steele, a sexual-assault nurse examiner at University Hospital, testified that she had examined a distraught and tearful Gipson shortly after the attack. Steele described Gipson's injuries, which included abrasions on her face and neck, bruises on her arms, and cuts on her lip and under a toe. Gipson also had vaginal abrasions and redness that were consistent with forced digital penetration. Steele saw what appeared to be blood stains on Gipson's T-shirt, so she submitted the T-shirt to the coroner's laboratory for testing.
 {¶ 15} Detective Steven Ventre testified that he had met Gipson at her apartment a week or so after the attack. In Gipson's daughter's bedroom closet, Ventre found a child's dress and pants that had what appeared to be blood on them. Ventre submitted the items to the coroner's laboratory.
 {¶ 16} Testing of Gipson's T-shirt and of the child's dress and pants revealed human blood stains. Deoxyribonucleic Acid ("DNA") testing of the T-shirt and of the pants revealed Bevins' blood on both items. No DNA testing was conducted on the dress.
 The Defense Case {¶ 17} Bevins presented the testimony of a Bevins family friend named Francine Jackson, who stated that, on the night of the attack, Gipson had called the police from her home, and that Gipson had pointed out a white van that she had seen driving away from the scene.
 {¶ 18} Annette Bevins testified that she had been married to Bevins for 25 years, but that they were separated. She and their two children lived in the apartment next to Gipson's. She testified that on the evening of November 7, 2000, she, Bevins, and her sister-in-law had driven in Bevins' light gray pickup truck to her daughter's home in North Carolina. They had arrived there the following morning.
 {¶ 19} Bevins' son testified that on November 8, 2000, which he remembered "plain as day, because [his] niece was born that day," he saw his father carry some bags or a bundle of clothes into Gipson's apartment. His father had a "busted up knuckle" from an incident that had occurred earlier that day. When his father came out of Gipson's apartment, his father's knuckle was bleeding.
 {¶ 20} Bevins' daughter, Patricia Slaughter, testified that she was living in North Carolina and that her family had visited her on November 8, 2000.
 {¶ 21} Bevins also called Cincinnati Police Officer Phillip Black to identify three photographs that he had taken of Bevins on November 15, 2000. Black said that he took the photographs because he had observed a scar over Bevins' left eye and some scars on his hand.
 {¶ 22} Black also identified three photographs of another man, one of which showed that man standing by the side of a white van. The man had been stopped by a patrol officer the night of the attack as a result of the descriptions that had been broadcast about the attack. Black testified that the van driver had been eliminated as a suspect when Bevins' blood was identified on Gipson's clothing.
 {¶ 23} William Hillard, a crime-scene investigator for the Cincinnati Police Division, testified that he had investigated the crime scene at Gipson's apartment on November 8, 2000. Hillard said that a fingerprint on the disinfectant spray can was not Bevins' fingerprint. He did not test the print to see if it was Gipson's.
 {¶ 24} Hillard identified nine photographs of the scene that the prosecutor had submitted into evidence. He testified that 48 photographs, from two rolls of film, were taken of the scene, and that "more than likely [he] took the pictures." He said that he did not know where the photographs were, and that he probably would have turned the photographs over to the case investigator.
 Prosecutorial Misconduct {¶ 25} In his first assignment of error, Bevins argues that prosecutorial misconduct during closing argument deprived him of a fair trial. He contends that the prosecutor improperly vouched for the credibility of the state's witnesses and denigrated defense counsel. Bevins failed to object in either instance, so he has waived all but plain error.[2]
 {¶ 26} The test for prosecutorial misconduct in closing argument is "`whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'"[3]
"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."[4] We must review the challenged comments not in isolation, but in the context of the entire closing argument.[5]
 A. Vouching for a Witness's Credibility {¶ 27} In closing argument, neither the prosecutor nor defense counsel is permitted to express his or her personal belief as to the credibility of a witness.[6] But both sides are free to comment on what the evidence has shown and on the reasonable inferences that might be drawn from the evidence.[7]
 {¶ 28} The Ohio Supreme Court has established that counsel "may state his or her opinion if it is based on the evidence presented at trial."[8] Consequently, this district, in two opinions authored by Judge Painter, has held that counsel may comment on the truthfulness and credibility of a witness so long as it is based on the witness's testimony.[9] For example, counsel may summarize a witness's testimony and point out apparent discrepancies or inconsistencies.[10] But counsel may not vouch for a witness's credibility because, "[i]n order to vouch for the witness, [counsel] must imply knowledge of facts outside the record or place [counsel's] personal credibility in issue."[11]
 {¶ 29} In closing argument, a prosecutor does not improperly vouch for a witness's credibility by arguing, based upon the evidence, that a witness was "a reliable witness to the simple events she witnessed, that she lacked any motive to lie, [or] that her testimony was not contradictory."[12] A prosecutor may argue facts in evidence to support a witness's credibility and may respond to defense attacks on the witness's credibility and mental abilities.[13]
 {¶ 30} In closing argument in this case, defense counsel remarked on the testimony of Bevins' alibi witnesses: "[The] [p]rosecutor might tell you [the family members] have an interest in the case. Well, sure they do. It's their father. Does that mean they're going to come in here and lie? They're going to fabricate this story about a trip to North Carolina just to get their father off? * * * I say not. I say they were believable."
 {¶ 31} Defense counsel went on to argue, "That's alibi. He was somewhere else at the time this incident happened. That's evidence. Consider it. Is it believable? Certainly is. And you can believe it."
 {¶ 32} In rebuttal, the prosecutor asked the jury to consider whether the testimony of the alibi witnesses was reasonable or believable, and whether it made sense. The prosecutor stated, "Now you determine, are these witnesses biased, do they have an interest in the case, do they have a stake in the outcome, are they family friends, are they family members, you decide.
 {¶ 33} "* * * Now, the Judge will tell you, you determine who you're going to believe. And you need to use reason and common sense when you determine the credibility of the witnesses. You consider whether the witness was reasonable or believable. Did his or her testimony make sense, was it believable.
 {¶ 34} "Now, let's look at the victim. She was four months pregnant at the time. She had no reason to lie about what happened to her. If she wanted to lie, she could have named Mr. Bevins from the get-go.
 {¶ 35} "But she didn't, because she didn't see who did this to her. She told the truth. She didn't know who did this to her, she could only give a description, a hair description, and she said the person who did this was wearing some type of blue work pants and flip-flops.
 {¶ 36} "What about Erica Moore, the neighbor? She had no reason to lie. She wasn't a friend of the defendant, she wasn't a friend of the victim. She was a neighbor. * * * Now why would Erica lie? She has no interest or stake in the case, she [ha]s no relationship to the victim or defendant. Was her testimony reasonable? Was it believable? Yes, it was.
 {¶ 37} "What about [nurse] Ann Steele? She had no interest or stake in the case. She was an unbiased witness. * * * Was her testimony reasonable, was it believable? Yes.
 {¶ 38} "Was [serologist] Joan Burke's testimony reasonable? Was it believable? Yes. She didn't have an interest in this case. She didn't have a stake in the outcome of this case."
 {¶ 39} The prosecutor properly asked jurors to consider the reasonableness of the witnesses' testimony and whether the witnesses had a bias or an interest in the outcome. These are some of the same factors that Ohio trial courts routinely instruct juries to consider in determining witness credibility,[14] and they were cited in direct response to defense counsel's argument. None of these remarks by the prosecutor was improper.
 B. Denigration of Defense Counsel {¶ 40} Bevins also argues that the prosecutor improperly denigrated defense counsel by stating, "Now, I know the defense here is trying to divert your attention or cloud the issue, but the main issue here is who did this, did the defendant do this, that's the main issue."
 {¶ 41} A prosecutor may not make unfair or derogatory personal references to defense counsel.[15] But in our review of closing arguments, we may not take a prosecutor's isolated comments out of context and give them their most damaging meaning.[16]
 {¶ 42} In State v. Smith, the Ohio Supreme Court rejected an argument that similar comments by a prosecutor had improperly denigrated defense counsel.[17] In Smith, the prosecutor had argued, "`You may know now why Mr. Bruner [defense counsel] says what he says is not evidence'; `He is doing what I cautioned you about. He is trying to direct your attention to somewhere else to what the evidence might be, what it could be, what he says that it is, when it is not what happened from the stand.'" The court held that the prosecutor's comments, while "somewhat theatrical," did not improperly denigrate defense counsel.[18]
 {¶ 43} In this case, the prosecutor made no derogatory personal reference to defense counsel. On the contrary, like the prosecutor inSmith, the prosecutor in this case simply pointed out that defense counsel was trying to direct the jury's attention elsewhere. Consequently, we conclude that the prosecutor's isolated remarks about defense counsel's argument were not improper. We overrule Bevins' first assignment of error.
 Self-Representation {¶ 44} In his second assignment of error, Bevins argues that the trial court erred by denying his request for self-representation. We considered and rejected this argument in Bevins' appeal in the case numbered C-050481, decided on October 20, 2006.[19] In that case, we sustained Bevins' conviction of assault on a corrections officer.
 {¶ 45} The trial court held a hearing at which it simultaneously addressed Bevins' motions for self-representation filed in this case and in the assault case. Accordingly, we overrule this assignment of error on the authority of our earlier decision.[20]
 Brady Violation {¶ 46} In his third assignment of error, Bevins argues that the state's failure to provide exculpatory evidence, and the trial court's denial of his motion for a new trial on Brady v. Maryland[21] grounds, violated his rights to due process. Bevins argues that the state's failure to produce for testing the child's dress that had been recovered from Gipson's apartment, and the state's introduction into evidence of only nine of 48 photographs of the scene, denied him of a fair trial. We find no merit in either assertion.
 {¶ 47} A Brady violation occurs when the state fails to disclose evidence materially favorable to the accused.[22] Evidence suppressed by the state is material within the meaning of Brady only if there exists a reasonable probability that the result of the trial would have been different had the evidence been disclosed to the defense.[23]
"The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense."[24]
 {¶ 48} A due-process violation does not result from the state's failure to preserve evidence "of which no more could be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."[25] The failure to preserve potentially useful evidence does not violate due process "unless a criminal defendant can show bad faith on the part of the police."[26]
 A. The Child's Dress {¶ 49} Before the trial in this case, Bevins filed a motion to dismiss based in part on the state's disclosure that the child's dress, which the coroner's laboratory had determined to be stained with human blood, was lost. The state had disclosed the existence of the dress and the results of the tests conducted on the dress well in advance of the first of Bevins' four trials on these charges. The record reveals no attempt by Bevins to have the dress re-tested for human blood or tested for DNA at any point in the four years between the state's disclosure of the evidence in discovery and Bevins' motion to dismiss filed before his latest trial.
 {¶ 50} Moreover, Bevins did not allege that the state had acted in bad faith in the loss of the dress. In asking the trial court to dismiss the charges, he argued only that testing of the dress "might show someone else's blood." Because Bevins failed to demonstrate bad faith by the state in its loss of the dress, and because he failed to demonstrate that the dress was material in a constitutional sense, we conclude that the trial court did not err in denying Bevins' motion to dismiss.
 B. Photographs {¶ 51} Before he was sentenced, Bevins filed a motion for a new trial, alleging that the state had introduced into evidence only nine of a possible 48 photographs taken by police. In support of his motion, Bevins argued that the "unintroduced" photographs might have shown clothing items in Gipson's apartment to be in places other than where police testified the items were found.
 {¶ 52} Months before Bevins' first trial, the state had revealed in discovery the existence of photographs and had made them available for inspection. At one point, the prosecutor made available to defense counsel the entire police file.
 {¶ 53} We will not second-guess a prosecutor's trial strategy in introducing into evidence some, but not all, photographs related to an offense. The prosecutor's decision may have been based on the quality of the photographs, their cumulative nature, or other considerations. In any event, we are not in a position to infer misconduct from the prosecutor's decision to present only a portion of the photographs.
 {¶ 54} Because Bevins has failed to demonstrate that the photographs not introduced by the prosecutor at trial were favorable to him or that they would have changed the result of the trial, we hold that the trial court did not err by denying his motion for new trial. Consequently, we overrule Bevins' third assignment of error.
 Weight and Sufficiency of the Evidence {¶ 55} In a challenge to the sufficiency of the evidence, the question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[27] In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror."[28] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[29]
 {¶ 56} To find Bevins guilty of aggravated burglary, in violation of R.C. 2911.11(A)(1), the jury had to find that Bevins, by force, stealth, or deception, had trespassed in an occupied structure, with purpose to commit in the structure any criminal offense, and that Bevins had inflicted physical harm on Nina Gipson. To find Bevins guilty of rape, in violation of R.C. 2907.02(A)(2), the jury had to find that Bevins had engaged in sexual conduct with Gipson and had purposely compelled her to submit by force or threat of force.
 {¶ 57} We hold that a rational juror, viewing the evidence in a light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Bevins had committed the offenses of aggravated burglary and rape. Therefore, the evidence presented was legally sufficient to sustain Bevins' convictions.
 {¶ 58} Although the Bevins family provided an explanation for his blood being found in Gipson's apartment, as well as a spurious alibi, the weight to be given the evidence and the credibility of the witnesses were primarily for the jury to determine.[30] Moreover, our review of the record does not persuade us that the jury clearly lost its way and created a manifest miscarriage of justice in finding Bevins guilty of the offenses. Accordingly, we overrule the assignment of error.
 Sentencing {¶ 59} In his fifth assignment of error, Bevins argues that the trial court erred by sentencing him to maximum, consecutive prison terms. Specifically, Bevins argues that the imposition of such sentences violated his Sixth Amendment right to a jury trial as set forth by the United States Supreme Court in Blakely v. Washington.[31] This assignment of error is well taken in light of the Ohio Supreme Court's decision in State v. Foster.[32]
 {¶ 60} Foster dictates that because the sentences were based on unconstitutional statutory provisions, we must sustain the assignment of error, vacate the sentence for each offense, and remand the case for resentencing.[33]
 Remaining "Assignment of Error" {¶ 61} Bevins' appellate counsel casts as a sixth assignment of error "certain issues for the [c]ourt to review without counsel due to difference of opinion on the merit of same." We find no merit in any of Bevins' assertions.
 A. Speedy Trial {¶ 62} First, Bevins argues that the trial court violated his right to a speedy trial under R.C. 2945.71. This argument has no merit. The Ohio Supreme Court has specifically held that R.C. 2945.71, Ohio's speedy-trial statute, "does not apply to criminal convictions that have been overturned on appeal."[34] Nor does the statute apply to a retrial following a mistrial declaration because of a hung jury.[35]
Instead, the time limit for bringing a person to trial whose conviction has been overturned on appeal, or whose retrial has resulted from a mistrial, is governed by theSixth Amendment to the United States Constitution
and Section 10, Article I of the Ohio Constitution.[36]
 {¶ 63} In this case, any delays between retrials were occasioned by Bevins' repeated requests for continuances and for new counsel, his failure to cooperate with counsel, newly assigned counsels' need to prepare, Bevins' multiple psychological evaluations, and his motions for experts and investigators. Consequently, we hold that Bevins was not denied the right to a speedy trial.[37]
 B. Ineffective Assistance of Counsel {¶ 64} Bevins argues that trial counsel was ineffective because he failed to object to the prosecutor's leading questions and failed to introduce photographs of injuries to the victim's genitalia. At trial, counsel expressed his concern that the jury could be "repulsed" by the graphic photographs, which may have resulted in prejudice to Bevins.
 {¶ 65} "Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial."[38] Failure to object to leading questions does not constitute ineffective assistance of counsel.[39] As to the photographs, we will not second-guess counsel's trial strategy.[40] In light of the nurse's testimony that she had observed a scratch and bruising about the victim's vagina, and the hospital record containing a diagram of the injuries, counsel's strategy was certainly reasonable. Consequently, Bevins has not demonstrated that counsel's performance was deficient.
 C. Admission of State's Exhibits {¶ 66} Bevins maintains that the admission into evidence of the state's exhibits was in error. The state introduced nine photographs that depicted numerous injuries to Gipson's face, neck, ankle, arms, and foot, and a photograph of her bloodied T-shirt. Both Gipson and Steele had testified to the authenticity and accurate depictions of the photographs. And the photographs had significant probative value and were not cumulative in their presentation.
 {¶ 67} The state introduced Gipson's T-shirt and her daughter's pants, which Gipson and Burke had identified. The state introduced a report from the coroner's office that was prepared and authenticated by Burke, and Gipson's hospital record, which was authenticated by Steele. Bevins raised no objection to the admission of photographs of Gipson's apartment or to the admission of a 911 recording. Consequently, we find no abuse of discretion by the trial court in the admission of any of the trial exhibits.[41]
 D. Competency {¶ 68} Bevins argues that the trial court erroneously admitted the competency-evaluation report of William S. Walters, Ph.D. Having failed at trial to object to the report's admission into evidence, Bevins has waived all but plain error. Bevins contends that the court should not have admitted Dr. Walters' report finding Bevins competent to stand trial because Dr. Walters had not evaluated him. We find no error in the court's admission of Dr. Walters' report or in the court's determination that Bevins was competent to stand trial.
 {¶ 69} The trial court held a competency hearing at which three psychologists testified. Nancy Schmidtgoessling, Ph.D., had attempted to interview Bevins on four different dates, but Bevins had refused to be evaluated. As a result, Dr. Schmidtgoessling did not render an opinion on Bevins' competency.
 {¶ 70} Dr. Walters and Robert Tureen, Ph.D., testified that they had met with Bevins on separate occasions, and that each time Bevins had refused to respond to their questions. According to Dr. Tureen, Bevins' silent behavior was controlled and purposeful. Both Drs. Walters and Tureen observed Bevins, reviewed his prior psychological evaluations, and spoke with corrections officers about him. Both opined that Bevins was competent to stand trial.
 {¶ 71} Corrections officers testified that they had had frequent contact with Bevins in the jail. They had seen Bevins laughing, talking, and playing cards with other inmates. Several days a week, Bevins was escorted by officers to the law library, where he used a computer to do work for himself and for other inmates.
 {¶ 72} Though he had been given numerous opportunities, Bevins continually refused to cooperate with the psychologists in their evaluations. Bevins failed to produce any evidence to rebut the presumption that he was competent.[42] Because there was reliable, credible evidence supporting the trial court's conclusion that Bevins understood the nature and objective of the proceedings against him, we will not disturb the finding that Bevins was competent to stand trial.[43]
 E. Sexual-Predator Determination {¶ 73} For an offender to be designated a sexual predator under R.C. 2950.09, the state must prove by clear and convincing evidence that the offender has been convicted of a sexually oriented offense, and that the offender is likely to engage in the future in one or more sexually oriented offenses.[44] In making the determination whether an offender is likely to engage in future sexually oriented offenses, the trial court is to consider all relevant factors, including those enumerated in R.C. 2950.09(B)(3).[45]
 {¶ 74} Here, the state presented overwhelming evidence that Bevins is a sexual predator. Bevins broke into a home in the middle of the night to attack a pregnant stranger. Even when Gipson hit him in the head with a glass, and her eight-year-old daughter tried to intervene, Bevins was undeterred in his quest to rape Gipson. As Bevins struggled violently with Gipson, he repeatedly threatened to kill Gipson and her daughter. It is difficult to imagine the type of person who could cause a mother to say to her child, "[B]abe, you have to listen and go and do what the man says or he going to kill mommy."
 {¶ 75} In a further display of cruelty, Bevins threw the child against a bedpost and injured her back. Still undeterred, Bevins continued his attack upon Gipson and even raped her in front of her little girl. Even after Bevins had digitally penetrated Gipson, he tried to force her into another room, unbuckling his belt as he went. Surely, there was ample support for the determination that Bevins demonstrated a great likelihood that he would commit a sexual offense in the future.
 {¶ 76} Bevins had an extensive criminal history that included multiple convictions for breaking and entering, theft, assault, and escape. In 1993, Bevins was paroled after serving about three years of a five-year prison sentence. After violating his parole, he was ordered back to prison. Bevins had also been sentenced to an eight-year prison term for escape, and to a one-year prison term for assaulting a corrections officer.
 {¶ 77} In making its determination, the trial court further considered the report of Sherry Baker, Ph.D, which stated that Bevins had a "moderate-high" risk of re-offending according to a test used to measure an offender's likelihood of re-offending. The court also considered testimony by Gipson at the classification hearing, as well as a presentence-investigation report and a victim-impact statement. Following our review of the record, we have no difficulty concluding that the trial court's adjudication was based upon ample evidence. In fact, it would have been difficult to find a defendant who presented a combination of factors better suited to the sexual-predator designation.
 {¶ 78} We agree with appellate counsel's conclusion that Bevins' pro se arguments have no merit. Accordingly, we overrule the sixth assignment of error.
 Conclusion {¶ 79} In conclusion, we sustain Bevins' fifth assignment of error and overrule the remaining assignments of error. We vacate the sentence and remand the cause for resentencing. In all other respects, the judgment of the trial court is affirmed.
Judgment accordingly.
WINKLER, J., concurs.
PAINTER, P.J., concurs in judgment only.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
Please Note:
The court has recorded its own entry on the date of the release of this decision.
[1] (1963), 373 U.S. 83, 83 S.Ct. 1194.
[2] State v. Tenace, 109 Ohio St.3d 255, 2006-Ohio-2417,847 N.E.2d 386, at ¶ 49, citing State v. Clemons, 82 Ohio St.3d 438, 451,1998-Ohio-406, 696 N.E.2d 1009.
[3] State v. Hessler, 90 Ohio St.3d 108, 125, 2000-Ohio-30,734 N.E.2d 1237, quoting State v. Smith (1984), 14 Ohio St.3d 13, 14,470 N.E.2d 883.
[4] Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940.
[5] State v. Keenan (1993), 66 Ohio St.3d 402, 410,613 N.E.2d 203.
[6] State v. Gapen, 104 Ohio St.3d 358, 2004-Ohio-6548,819 N.E.2d 1047, at ¶ 95, certiorari denied sub nom. Gapen v. Ohio (2005),___ U.S. ___, 126 S.Ct. 97; State v. Williams, 79 Ohio St.3d 1, 12,1997-Ohio-407, 679 N.E.2d 646.
[7] State v. Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting State v. Stephens (1970), 24 Ohio St.2d 76, 82,263 N.E.2d 773.
[8] State v. Jackson, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, at ¶ 154, certiorari denied sub nom. Jackson v. Ohio (2006),___ U.S. ___, 126 S.Ct. 2359; State v. Leonard, 104 Ohio St.3d 54,2004-Ohio-6235, 818 N.E.2d 229, at ¶ 159; State v. Williams,99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 46, certiorari denied sub nom. Williams v. Ohio (2004), 541 U.S. 963, 124 S.Ct. 1722, quotingState v. Watson (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97.
[9] State v. Little, 1st Dist. No. C-030432, 2004-Ohio-2279, at ¶ 83;State v. Seay, 1st Dist. No. C-040763, 2005-Ohio-5964, at ¶ 33, jurisdictional motion overruled, 109 Ohio St.3d 1494, 2006-Ohio-2762,848 N.E.2d 857.
[10] State v. Harriel, 1st Dist. No. C-040771, 2006-Ohio-2616, at ¶ 31, jurisdictional motion overruled, 111 Ohio St. 3d 1417,2006-Ohio-5083, 854 N.E.2d 1094.
[11] State v. Jackson, 107 Ohio St.3d 53, 2005-Ohio-5981,836 N.E.2d 1173, at ¶ 117, certiorari denied sub nom. Jackson v. Ohio (2006), U.S.,126 S.Ct. 2940, citing State v. Keene, 81 Ohio St.3d 646, 666,1998-Ohio-342, 693 N.E.2d 246.
[12] State v. Green, 90 Ohio St.3d 352, 373-374, 2000-Ohio-182,738 N.E.2d 1208; Jackson, supra, at ¶ 120, 2005-Ohio-5981, 836 N.E.2d 1173;State v. Bethel, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶¶ 194-195.
[13] Green, supra, at 374, 2000-Ohio-182, 738 N.E.2d 1208; State v.Woodard, 68 Ohio St.3d 70, 76, 1993-Ohio-241, 623 N.E.2d 75.
[14] See 4 Ohio Jury Instructions (2005), Section 405.20.
[15] See Smith, supra, at 14, 470 N.E.2d 883.
[16] State v. Cunningham, 105 Ohio St.3d 197, 2004-Ohio-7007,824 N.E.2d 504, at ¶ 86, certiorari denied sub nom. Cunningham v. Ohio
(2005), U.S., 126 S.Ct. 110, citing Donnelly v. DeChristoforo (1974),416 U.S. 637, 647, 94 S.Ct. 1868; State v. Leonard, supra,2004-Ohio-6235, 818 N.E.2d 229, at ¶ 161.
[17] 87 Ohio St.3d 424, 2000-Ohio-450, 721 N.E.2d 93.
[18] Id. at 443, 2000-Ohio-450, 721 N.E.2d 93.
[19] State v. Bevins, 1st Dist. No. C-050481, 2006-Ohio-5455.
[20] Id.
[21] Brady, supra, 373 U.S. 83, 83 S.Ct. 1194.
[22] Id. at 87, 83 S.Ct. 1194.
[23] State v. Yarbrough, 104 Ohio St.3d 1, 2004-Ohio-6087,817 N.E.2d 845, at ¶ 69; United States v. Bagley (1985), 473 U.S. 667, 682,105 S.Ct. 3375.
[24] United States v. Agurs (1976), 427 U.S. 97, 109-110,96 S.Ct. 2392.
[25] Arizona v. Youngblood (1988), 488 U.S. 51, 57,109 S.Ct. 333.
[26] Id. at 58, 109 S.Ct. 333; Illinois v. Fischer (2004),540 U.S. 544, 124 S.Ct. 1200.
[27] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[28] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[29] Id.
[30] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[31] (2004), 542 U.S. 296, 124 S.Ct. 2531.
[32] 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraphs one, two, three, and four of the syllabus, certiorari denied sub nom.Foster v. Ohio (2006), ___ U.S. ___, 127 U.S. 442.
[33] See id. at ¶¶ 103 and 104.
[34] State v. Hull, 110 Ohio St.3d 183, 2006-Ohio-4252,852 N.E.2d 706, paragraph one of the syllabus.
[35] State v. Fanning (1982), 1 Ohio St.3d 19, 437 N.E.2d 583.
[36] See id. at 21, 437 N.E.2d 583; Hull, supra, 110 Ohio St.3d 183,2006-Ohio-4252, 852 N.E.2d 706, paragraph two of the syllabus.
[37] See Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182.
[38] State v. Newton, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 97, citing Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, and State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373, paragraph two of the syllabus.
[39] State v. Jackson, 92 Ohio St.3d 436, 449, 2001-Ohio-1266,751 N.E.2d 946.
[40] See State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815,848 N.E.2d 810, certiorari denied sub nom. Conway v. Ohio (2006), ___ U.S.___, ___ S.Ct. ___.
[41] State v. Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391,819 N.E.2d 215.
[42] See R.C. 2945.37.
[43] State v. Williams (1986), 23 Ohio St.3d 16, 19,490 N.E.2d 906.
[44] R.C. 2950.01(E); State v. Eppinger, 91 Ohio St.3d 158, 163,2001-Ohio-247, 743 N.E.2d 881.
[45] See Eppinger, supra, at 166, 2001-Ohio-247, 743 N.E.2d 881.