DECISION. *Page 2 
{¶ 1} Cameron McGlothin appeals his convictions for murder with specifications, having a weapon under a disability, aggravated robbery with specifications, and robbery with specifications. His assignments of error do not have merit, so we affirm the judgment of the trial court.
 {¶ 2} On August 21, 2005, Anthony Chastain was robbed and fatally shot. At trial, the state's witnesses testified that McGlothin had arranged for the robbery of Chastain. Randall Patterson testified that McGlothin had told him that Chastain had money and had asked him to help rob Chastain. Patterson refused. Timothy Ridley testified that he was in McGlothin's house on the night of the shooting. Ridley stated that McGlothin had tried to talk him and Kevin Short into robbing Chastain. According to Ridley, McGlothin knew that Chastain, who was a drug dealer, had a large amount of money, and McGlothin needed money to buy crack cocaine. McGlothin was also motivated to rob Chastain because he and Chastain had had an argument about a local prostitute. Ridley testified that he had not wanted to participate in the robbery, but that Short had.
 {¶ 3} Miranda Kramer, who lived across the street from McGlothin, saw the robbery and shooting. According to Kramer, in the early morning hours of August 22, Chastain arrived in a car in the front of McGlothin's house. McGlothin came out of his house and spoke with Chastain. Then Kevin Short ran up to Chastain, pointed a gun at him, and told him to remove his clothing. Short shot at Chastain, and McGlothin went to the ground. When Chastain ran away, Short chased him and continued to shoot at him. McGlothin got up, got into Chastain's car, and took the keys to the car. Kramer then saw McGlothin and other individuals searching *Page 3 
Chastain's car. Gerald Akins testified that he had also seen McGlothin in Chastain's car.
 {¶ 4} After running away from Short, Chastain broke into a house that was a short distance from McGlothin's house. When the police arrived to investigate a report of a breaking and entering at that house, they found Chastain dead in the bathroom of the house.
 {¶ 5} McGlothin's neighbor, Charles Moore, testified that McGlothin had asked him to tell police that McGlothin had stayed at his house on the night of the robbery and shooting.
 {¶ 6} At the conclusion of the trial, the jury found McGlothin guilty of murder with specifications, having a weapon under a disability, aggravated robbery with specifications, and robbery with specifications. The trial court sentenced him to 15 years to life for the murder; three years for one of the specifications to the murder; one year for having a weapon under a disability; nine years for the aggravated robbery; and seven years for the robbery. The sentences for the murder, the specification, having a weapon under a disability, and the aggravated robbery were to be served consecutively, but were otherwise made concurrent with the sentence for the robbery. The aggregate sentence was 28 years to life.
 Amendment of Indictment {¶ 7} For ease of discussion, we consider McGlothin's assignments of error in the order that the issues arose during the trial. In his first assignment of error, McGlothin asserts that the trial court erred when it allowed the state to amend the indictment. *Page 4 
 {¶ 8} Before the trial started, the state moved to amend the indictment to reflect that McGlothin was a complicitor, rather than the principal, in the crimes and to change the felony underlying the murder from felonious assault to aggravated robbery. After closing arguments, the state again moved to amend the indictment to change the date of the offenses from August 21 to August 22. The court granted both requests to amend the indictment.
 {¶ 9} "The court may at any time before, during, or after a trial amend the indictment * * *, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."[1] The amendments of the indictment in this case did not change the name or the identity of any of the crimes. Because the substance of the indictment was changed by the amendments, McGlothin had the right to request that the jury be discharged or that a continuance be granted.[2] But he made no such request. And even if he had requested the discharge of the jury or a continuance, it would not have been error to deny the request, as McGlothin would not have been able to prove that he was misled or prejudiced by the amendments. The first assignment of error is overruled.
 Jury Issues {¶ 10} McGlothin claims in his second assignment of error that the trial court erred when it did not dismiss a prospective juror for cause. A prospective juror who discloses that he cannot be fair and impartial or that he will not follow the law may *Page 5 
be challenged for cause.[3] We review a trial court's refusal to remove a potential juror for cause to determine whether it was an abuse of discretion.[4]
 {¶ 11} During voir dire, prospective juror Taylor revealed that he was a retired police officer, and that he knew one of the police officers who would be testifying. Taylor stated that, despite his acquaintance with the police officer, he would be fair and impartial. Upon questioning by McGlothin's attorney, Taylor stated that he probably had a natural bias in favor of police officers, but that he could put aside that bias if he was selected as a juror. He also said that he generally believed that defense attorneys clogged the justice system, but that he did not know McGlothin's attorneys well enough to have formed an opinion of them. He reiterated that he would keep an open mind if he were a juror. The trial court denied McGlothin's request that Taylor be excused for cause. McGlothin later used one of his peremptory challenges to remove Taylor from the jury.
 {¶ 12} We conclude that the trial court did not abuse its discretion in refusing to remove Taylor for cause. Taylor was honest about his preconceptions about attorneys and police officers but repeatedly stated that he could put aside those preconceptions if he was a juror. The trial court believed him. Also, Taylor did not indicate that he would refuse to apply the applicable law. The second assignment of error is overruled.
 {¶ 13} Because it also concerns an issue with the jury, we next consider the eighth assignment of error. In it, McGlothin claims that the trial court erred when it *Page 6 
did not declare a mistrial when a jury member revealed that she may have known one of McGlothin's witnesses.
 {¶ 14} McGlothin called Desiree Dozier on his behalf. The state had alleged that McGlothin and Chastain had gotten into an argument over Dozier, a prostitute. McGlothin's counsel attempted to contradict testimony about ill will between McGlothin and Chastain by having Dozier testify that she was not aware of a fight between them.
 {¶ 15} After Dozier testified, a juror told the court's bailiff that she believed that she may have known Dozier and her family eight years earlier. The court and the attorneys questioned the juror in chambers. The juror told the court that when Dozier was called as a witness, she had realized that her last name sounded familiar. According to the juror, she knew unfavorable information about the family and Desiree, and that information could have affected her evaluation of Dozier's credibility. But the juror said that she was not sure that Dozier was the same person whom she knew about, that she could put aside what she potentially knew about Dozier, and that she had told no other juror about what she knew. The trial court asked the juror not to discuss the matter with other jurors.
 {¶ 16} To succeed on his motion for a mistrial, McGlothin had to show that there had been juror misconduct and that the misconduct had materially affected his substantial rights.[5] The trial court's refusal to declare a mistrial is subject to an abuse-of-discretion review.[6] Here, McGlothin did not demonstrate juror misconduct. The juror came forward with the information without having discussed it with fellow jurors. And the juror was not even certain that Dozier was the same *Page 7 
person whom she had known. There was no evidence that the juror had concealed her potential knowledge about Dozier during voir dire. Finally, the court was in the best position to weigh the juror's credibility when she stated that she could remain fair and impartial. We conclude that the court did not abuse its discretion when it refused to declare a mistrial. The eighth assignment of error is overruled.
 Prosecutorial Misconduct {¶ 17} The third assignment of error is that McGlothin was denied his due-process rights because the prosecutor engaged in conduct that deprived McGlothin of a fair trial.
 {¶ 18} McGlothin called Short to testify on his behalf. Before taking the stand in front of the jury, Short asserted his right not to incriminate himself and refused to testify. McGlothin claimed that Short was refusing to testify because he had been intimidated by the assistant prosecutor. Prior to calling Short, McGlothin's attorneys informed the court that the assistant prosecutor had told Short's counsel that if Short testified, he would receive no consideration in the pending case against him. The trial court questioned Short's counsel to understand what had happened. Short's counsel stated that his understanding was that "[the assistant prosecutor] was certainly not going to recommend any deal if [Short] testified, not that he couldn't testify." He also told the court that the assistant prosecutor had not advised him that Short should refuse to testify. It is clear from the record that the assistant prosecutor was referring to case consideration that had been offered to Short had he testified on behalf of the state. But because the assistant prosecutor did not believe Short to be credible, he had decided not to call Short as a witness. The assistant prosecutor's statements to Short's counsel made clear that any previously offered consideration *Page 8 
was off the table. And Short's counsel stated that, aside from the conversation that he had had with the assistant prosecutor, he did not believe that it was in Short's best interest to testify. We conclude that the record does not support McGlothin's assertion that Short had been intimidated from testifying by the assistant prosecutor.
 {¶ 19} McGlothin also asserts that the assistant prosecutor engaged in misconduct during closing arguments by vouching for the credibility of the state's witnesses and by calling McGlothin a liar. We must review the assistant prosecutor's statements to determine "whether [they] were improper and, if so, whether they prejudicially affected substantial rights of the defendant."[7]
 {¶ 20} During closing argument, the prosecutor and defense counsel are not permitted to express their personal beliefs as to a witness's credibility, but they are "free to comment on what the evidence has shown and on the reasonable inferences that might be drawn from the evidence."[8]
 {¶ 21} McGlothin's claim that the assistant prosecutor improperly vouched for the credibility of the state's witnesses is not borne out by the record. During closing argument, McGlothin's counsel repeatedly stated that Ridley, Akins, and Patterson were liars. In the second part of his closing argument, the prosecutor commented on facts in evidence in response to the attacks on the credibility of the state's witnesses. Such argument was not improper.[9]
 {¶ 22} At two points during his closing argument, the assistant prosecutor stated that McGlothin had lied. He said, "I know in his statement he lied all over the place." And he later said, "The defendant lied. He has lied so many times in this *Page 9 
case. `I don't know who committed the offense.'" These statements were based upon McGlothin's statements to police investigators, which had been offered into evidence during the trial by McGlothin.
 {¶ 23} McGlothin gave two taped statements to police investigators. In the first, he denied that he knew Short and Ridley, that he had abused drugs, that he had known Chastain had money, and that he had known who was involved in the robbery. In the second statement, McGlothin agreed with the investigators that he had lied to them, and he stated that Short was the shooter. Stating that the defendant has lied is not necessarily prosecutorial misconduct. The Ohio Supreme Court has held that a prosecutor who called a defendant a "liar" was entitled to attack the defendant's credibility.[10] Here, the assistant prosecutor's statements were not expressions of his personal beliefs about McGlothin's credibility. Rather, the statements were fair comments based on what had been heard in McGlothin's statements to investigators. We conclude that the assistant prosecutor's statements were not improper, and we, therefore, overrule the third assignment of error.
 Sequestration Violations {¶ 24} McGlothin's sixth assignment of error is that the trial court erred when it failed to correct a sequestration violation. Before the trial started, the court ordered all witnesses who were scheduled to testify to leave the courtroom and not to discuss their testimony with any other witnesses. During cross-examination, Ridley stated that he had gone to lunch with state's witnesses Patterson, Akins, and Moore during the trial. Patterson stated that he had provided transportation to court to Chastain's mother, Moore, and Akins. But neither Ridley nor Patterson said that he *Page 10 
had discussed his testimony with other witnesses. We conclude that McGlothin did not demonstrate that there had been any violation of the court's sequestration order. The sixth assignment of error is overruled.
 Evidentiary Issues {¶ 25} McGlothin's seventh assignment of error is that the trial court erred when it permitted the admission of other-acts evidence and hearsay testimony.
 {¶ 26} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."[11] McGlothin argues that the trial court improperly allowed the admission of evidence of his other crimes, wrongs, or acts on three occasions.
 {¶ 27} Akins testified during cross-examination that McGlothin had tried to induce McGlothin's son into robbing Akins. Any error in the admission of this evidence was invited error, as the statement was made in response to a question by McGlothin's attorney.
 {¶ 28} The other two statements to which McGlothin now objects were statements by Patterson and another witness that McGlothin had used drugs regularly. McGlothin's attorneys objected to neither statement, so we review the admission of the testimony under a plain-error analysis.[12] Plain error exists only where, but for the error, the outcome of the trial would clearly would have been different.[13] We conclude that even if these statements had not been admitted, the result of the trial would not have changed. The seventh assignment of error is without merit. *Page 11 
 Weight of the Evidence {¶ 29} In his ninth assignment of error, McGlothin asserts that his convictions were against the manifest weight of the evidence. When reviewing whether a judgment is against the manifest weight of the evidence, we sit as a thirteenth juror to determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[14]
 {¶ 30} McGlothin argues that the state did not prove that he was complicit with Short in the robbery and shooting of Chastain. According to McGlothin, the witnesses who tied McGlothin to the planning and execution of the robbery were not credible. But the jury was in the best position to weigh the witnesses' credibility. McGlothin also argues that Short stated that he had acted alone. But that statement was not introduced at trial and was therefore not before the jury for its consideration. Having reviewed the record, we conclude that the jury's verdicts of guilt were not against the manifest weight of the evidence. The ninth assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 31} McGlothin claims in his fifth assignment of error that he was denied the effective assistance of counsel. To prevail on his claim that his counsel was ineffective, McGlothin must demonstrate that his counsel's performance was deficient and that, absent his counsel's errors, the result of the trial would have been different.[15] Our review of counsel's performance must be "highly deferential."[16] *Page 12 
 {¶ 32} According to McGlothin, his trial attorneys were unprepared for trial. McGlothin contends that his attorneys' lack of preparation was evidenced by their request for a continuance twenty days before the trial began, their failure to timely request the testing of a bullet, their failure to disclose witnesses, and their failure to secure a witness, Pam Ray, for trial. But McGlothin has not demonstrated how the outcome of the trial would have differed had his counsel taken the actions that he now cites.
 {¶ 33} McGlothin also asserts that his attorneys were deficient because they did not object to the amendment of the indictment. We have already determined that the court did not err when it amended the indictment as requested by the state, so we are unable to conclude that attorneys' performance was deficient when they did not object. Nor are we persuaded that counsel was deficient for failing to object to the prosecutor's comments during closing argument, because we have determined that the prosecutor's comments were not improper. Finally, we have already determined that the outcome of the trial would not have differed had McGlothin's counsel objected to evidence that he was a drug user.
 {¶ 34} The fifth assignment of error is overruled.
 Motion for New Trial {¶ 35} McGlothin's fourth assignment of error is that the trial court erred when it overruled his motion for a new trial. Prior to the sentencing hearing, McGlothin filed a motion for a new trial or a judgment of acquittal. Attached to the motion was Short's affidavit in which Short stated that he had acted alone, that McGlothin had not encouraged him to rob Chastain, and that Short had been told to lie by Patterson. After a hearing, the trial court denied the motion. *Page 13 
 {¶ 36} Under Crim.R. 33(A)(6), the trial court may grant a new trial "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at trial." We review the trial court's denial of a motion for a new trial based on newly discovered evidence under an abuse-of-discretion standard.[17]
 {¶ 37} "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."[18]
 {¶ 38} Courts have split on whether the newly available testimony of a codefendant who has previously invoked his Fifth Amendment privilege against self-incrimination qualifies as "newly discovered evidence" for purposes of determining whether a new trial should be granted. Although never faced squarely with the issue in terms of a motion for a new trial, this court has considered whether an affidavit of a codefendant offered after a trial in which a codefendant had invoked his Fifth Amendment privilege against self-incrimination was sufficient for the defendant to obtain leave to file a delayed motion for a new trial under Crim.R. 33(B). Under that provision, if a defendant does not file a motion for a new trial within 120 days of the jury's verdict, he must seek leave to file a motion for a new trial. To obtain leave, the defendant must demonstrate clearly and convincingly that he was unavoidably *Page 14 
prevented from discovering the evidence within the 120-day period.[19]
In State v. Mathis,[20] we concluded that where an affiant had refused to testify during the defendant's trial, the defendant had not demonstrated clearly and convincingly that he had been unavoidably prevented from discovering the evidence offered in the affidavit within the allotted time.
 {¶ 39} Less than five years later, we faced a similar issue inState v. Condon.[21] In that case, Condon sought leave to file a motion for a new trial a year and a half after his convictions for eight counts of gross abuse of a corpse. Included with his motion was an affidavit from his codefendant, who had invoked his Fifth Amendment rights during Condon's criminal trial. The affidavit, which had been filed in a civil case, exculpated Condon from the abuse of one of the corpses. This court concluded that the trial court had abused its discretion when it denied Condon's motion for leave to a file a delayed motion based on the affidavit and overruled Mathis to the extent that it held otherwise.[22]
 {¶ 40} In arriving at our conclusion, this court cited favorably a decision from the First Circuit Court of Appeals in which the court had held that "newly discovered" in the corresponding federal rule, Fed.R.Crim.P. 33, encompassed newly available evidence.[23] In concluding that Condon had met his burden of showing that he had been unavoidably prevented from discovering the evidence, this court acknowledged that equating "newly discovered" with "newly available" was a minority view.[24] *Page 15 
 {¶ 41} The majority view, as explained by the Third Circuit Court of Appeals in United States v. Jasin, is that, given the clear language of Fed.R.Crim.P. 33, "`newly available evidence' is not synonymous with `newly discovered evidence.'"[25] To consider the testimony of a codefendant after he has been sentenced as newly discovered evidence "would encourage perjury to allow a new trial once co-defendants have determined that testifying is no longer harmful to themselves."[26] We agree with the reasoning of the Third Circuit that the majority view "establish[es] a straightforward bright-line rule, [and] is anchored in the plain meaning of the text."[27] Accordingly, we adopt the majority view. To the extent that State v. Condon held otherwise, we overrule it.
 {¶ 42} In the case before us, application of the majority view leads us to conclude that the evidence offered in Short's affidavit was not newly discovered. McGlothin's attorneys knew about the testimony during the trial. That is precisely why they called Short to testify at McGlothin's trial. McGlothin was unable to meet the second prong ofPetro — that the evidence had been discovered since the trial. The trial court did not abuse its discretion in denying the motion. We, therefore, overrule the fourth assignment of error and affirm the trial court's judgment.
Judgment affirmed.
HENDON, J., concurs.
PAINTER, P.J., concurs in part and dissents in part.
[1] Crim.R. 7(D).
[2] Id. See, also, State v. O'Brien (1987), 30 Ohio St.3d 122,508 N.E.2d 144.
[3] R.C. 2313.42(J).
[4] Berk v. Matthews (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus; State v. Albert, 10th Dist. No. 06AP-439, 2006-Ohio-6902.
[5] Crim.R. 33(A)(2). See, also, State v. Taylor (1991),73 Ohio App.3d 827, 598 N.E.2d 818.
[6] Taylor, supra, at 833.
[7] State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883.
[8] State v. Bevins, 1st Dist. No. C-050754, 2006-Ohio-6974, at ¶27.
[9] Id. at ¶ 29.
[10] State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160,840 N.E.2d 1032; State v. Leonard, 104 Ohio St.3d 54, 2004-Ohio-6235,818 N.E.2d 229.
[11] Evid.R. 404(B).
[12] See Evid.R. 103(A) and Crim.R. 52(B).
[13] State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus.
[14] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[15] See State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373; Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[16] Strickland, supra, at 689.
[17] State v. Scheibel (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus.
[18] State v. Petro (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus.
[19] Crim.R. 33(B).
[20] (1999), 134 Ohio App.3d 77, 730 N.E.2d 410.
[21] 157 Ohio App.3d 26, 2004-Ohio-2031, 808 N.E.2d 912.
[22] Condon, supra, at ¶ 20.
[23] U.S. v. Montilla-Rivera (C.A.1, 1997), 115 F.3d 1060, 1066. InCondon, the court incorrectly referred to the deciding court inMontilla-Rivera as the 11th Circuit Court of Appeals. See, also,State v. Barber (1982), 3 Ohio App.3d 445, 445 N.E.2d 1146.
[24] Condon, supra, at ¶ 18.
[25] (C.A.3, 2002), 280 F.3d 355, 368. See, also, United States v.Glover (C.A.6, 1994), 21 F.3d 133; United States v. Freeman (C.A.5, 1996), 77 F.3d 812; United States v. Theodosopoulos (C.A.7, 1995),48 F.3d 1438.
[26] United States v. Reyes-Alvarado (C.A.9, 1992), 963 F.2d 1184,1188.
[27] Jasin, supra, at 368.