[Cite as *State v. Samueal*, 2023-Ohio-3322.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220641 |
| | | TRIAL NO. B-2005986 |
| Plaintiff-Appellee, | : | |
| | : | *O P I N I O N.* |
| vs. | | |
| | : | |
| ARREON SAMUEAL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: September 20, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Brian T. Goldberg*, for Defendant-Appellant.

**CROUSE, Presiding Judge.**

{¶1} Defendant-appellant Arreon Samueal was convicted by a jury of murder and felonious assault, both with firearm specifications, and having weapons while under disability. On appeal, Samueal contends that the court erred in failing to declare a mistrial after an instance of alleged juror misconduct and in instructing the jury on the credibility of expert testimony. He also challenges the evidence supporting his convictions and argues that the aggregate sentence included in the judgment entry is erroneous. For the reasons that follow, we remand the cause for the trial court to correct the discrepancy in the judgment entry, but we affirm the trial court's judgment in all other respects.

## *I. Factual and Procedural Background*

{¶2} On the night of November 7, 2020, Roberto Williams was shot and killed in the parking lot of the New Generations Event Center ("Event Center") on Paddock Road in Hamilton County, Ohio.

{¶3} Clifford Gaither testified that he and Williams were finishing up a night of work at the Event Center and that he was planning to drive Williams home. Gaither testified that after locking the doors of the Event Center he noticed a white "Chevrolet or Impala" parked next to his truck on the driver's side. Both vehicles were pulled straight-in, facing the building. Gaither testified that Williams was standing outside of the truck, by its ajar passenger-side door, talking to another person. Gaither got into his truck to wait for Williams. Gaither could not see the other person due to Williams obstructing his view. Gaither explained that he heard Williams say, "my big brother is getting ready to take me home," to which the other person responded, "your big

brother is taking you home, huh?" Gaither testified that he then heard three or four gunshots in rapid succession.

{¶4} Gaither got out of his truck, and ran around its front end to check on Williams. At the same time, the shooter ran around the back of the truck to get into the white sedan. Gaither testified that it was so dark that he could not see the person's face, but he could see that he was shorter than Williams, had a goatee, and was wearing a red, black, and white hooded jacket and a black skullcap.

{¶5} Gaither called 9-1-1, relayed these details to the operator, and waited for police to arrive. Police arrived and processed the scene.

{¶6} That night, Gaither told police that he recognized the shooter's voice, but admitted that he could not quite place it. Gaither testified that, "It just stayed on my mind. I just kept thinking over and over, that voice, I have heard it before." Days later, Gaither went back to the police and told them that the shooter's voice was that of his great-nephew, Samueal. Gaither testified that he was "200 percent" sure that the voice he heard was Samueal's.

{¶7} Police also tracked down the white Chevrolet identified at the scene that they discovered, during the course of their investigation, was registered to Jahlen Price. After making several attempts to speak to Price, an attorney representing Price called police and agreed to a meeting. Price's car was processed, and a black skullcap was found inside.

{¶8} Price testified that he was Samueal's childhood friend, and that Samueal had been staying with his mother, Vicki Price. On the night of the shooting, Samueal and Price went to Ms. Price's apartment together. Price's description of Samueal's clothing on the night of the shooting matched Gaither's description: a red, black, and

3

white jacket, and a black skullcap. Price also said Samueal was wearing black pants. Price testified that Samueal showed him a handgun, "either a .38 or a .380" and its bullets, while en route to Ms. Price's apartment.

{¶9}   Samueal and Price then left Ms. Price's apartment together in Price's car. Price testified that, later in the evening after running a few errands, Samueal asked Price to take him to the Event Center. Price obliged. Price testified that, upon arrival, Samueal "[h]opped out, [and] said, I be right back." Price waited in the car. Several minutes later, Price heard multiple gun shots. He testified that Samueal got back into his vehicle and said, "drive, drive, drive." Price "got out of there as fast as [he] could." He testified that once they were on the highway, he saw Samueal taking bullets out of his gun. Yet, on cross-examination, Price admitted that he told police that he had not seen Samueal with a gun after the shooting.

{¶10}   Price dropped Samueal back off at Ms. Price's apartment, and then left. One hour later, Price got an alert on his phone that someone had been shot in the parking lot of the Event Center and that the suspect had fled in a white sedan. Price testified that he immediately went to Ms. Price's apartment and told Samueal to leave "[b]ecause if you put two and two together, he just shot that man where we was just at." Price testified that when he arrived, Samueal was no longer wearing the same clothes.

{¶11} Days later when Price met with police, he brought a plastic bag containing several articles of clothing that, according to Ms. Price's testimony, she found in her laundry room. The bag contained the red, black, and white jacket, a shirt, black pants, and a pair of shoes.

{¶12} Samueal was identified as the source of the major DNA profile obtained from the skullcap, t-shirt, and black pants, but was excluded as the source of the major DNA profile obtained from the jacket. No blood was found on any of the clothing, but gunshot residue was found on the sleeves of the red, white, and black jacket. Additionally, Samueal's fingerprints were identified inside the vehicle, and his cellphone records placed him in the area at the time the shooting occurred.

{¶13} The state also offered evidence of the projectiles found at the scene and in Williams's hip. Kelsey Cramer, Firearm Toolmark Examiner for the Ohio Bureau of Criminal Identification and Investigation testified that the projectile found at the scene matched the projectile found in Williams's hip. Cramer testified that both projectiles were fired from the same weapon and were consistent with a .38-caliber weapon, though she admitted that there was a "very long list" of other possible weapons.

{¶14} The jury found Samueal guilty on all counts: count one for murder in violation of R.C. 2903.02(B), with firearm specifications; count two for murder in violation of R.C. 2903.02(A), with firearm specifications; count three for felonious assault in violation of R.C. 2903.11(A)(2), with firearm specifications; and counts four and five for heaving weapons under disability in violation of R.C. 2923.13(A)(2) and (3). The court merged counts two and three with count one and sentenced Samueal to 15 years to life in the Ohio Department of Corrections for murder. The court also merged the first firearm specification with the second, and imposed a three-year sentence, consecutive to the sentence in count one. Finally, the court merged count five with count four, and imposed a three-year sentence for having weapons under disability. The sentences for counts one and four were ordered to be served

consecutively for a total aggregate sentence of 21 years to life in the Ohio Department of Corrections.

**{¶15}** Samueal timely appealed.

### *II. Juror Misconduct*

**{¶16}** In his first assignment of error, Samueal contends that a juror's comment about a defendant's decision to testify materially affected his substantial rights, such that a new trial should be granted. Samueal did not raise this issue below and has therefore waived all but plain error. *See State v. West,* 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, ¶ 22; *State v. Crawford*, 1st Dist. Hamilton No. C-070816, 2008-Ohio-5764, ¶ 49.

**{¶17}** To establish plain error, an appellant must demonstrate that "an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." *State v. Bailey*, Slip Opinion No. 2022-Ohio-4407, ¶ 8, quoting *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 66, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Even where plain error is identified, the court is not obligated to correct it. *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

**{¶18}** To demonstrate juror misconduct necessitating a mistrial, Samueal must show that the misconduct materially affected his substantial rights. *State v. McGlothin*, 1st Dist. Hamilton No. C-060145, 2007-Ohio-4707, ¶ 16, citing *State v.*

*Taylor*, 73 Ohio App.3d 827, 833, 598 N.E.2d 818 (4th Dist.1991). Where issues of perceived bias arise, the juror's impartiality must be "coupled with a lack of juror rehabilitation or juror assurance of impartiality" to warrant his or her dismissal from the jury. *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 74, quoting *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir.2004).

{¶19} In this case, Juror Number 15 came forward and alleged that Juror Number 9 had said that "If she were on trial for murder, she would take the stand and risk perjury versus being convicted of murder" while approximately half of the jurors were within earshot in the jury room. Juror Number 9 told the court that she said "I would get on the stand if it was me. Perjury versus murder is kind of extreme." She said one juror responded by saying "the best thing is going to be to sit there and say nothing." She assured the court that she was speaking generally and "wasn't talking about this case, in particular." She also assured the court that she could remain impartial and had not formed any opinions about the case.

{¶20} After this discussion, the *state* moved for Juror Number 9's removal based on bias. The defense *opposed the removal* of the juror, arguing that it was an "off-the-cuff comment," and that she assured the court she was not referring to this case in particular, and indicated that she had not yet formed an opinion about the case. Defense counsel argued that had other jurors been bothered by this comment, they would have come forward like the other juror had.

{¶21} The court agreed with defense counsel and, relying on the Supreme Court's guidance in *Kirkland,* 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 74, found that Juror Number 9 was "very sincere in her concern about trying to be impartial and fair in this case." The court stated further that, "I do not find that she

7

has any clear or overwhelming bias. Even if she did, I find that she has been rehabilitated and provided adequate assurances of her impartiality. I find no indication that the jury has been tainted in any way by this comment."

**{¶22}** The trial court appropriately handled the issue by discussing the comment with the juror and receiving assurances from her that she could remain impartial. *See McGlothin,* 1st Dist. Hamilton No. C-060145, 2007-Ohio-4707, at ¶ 16 (holding no abuse of discretion in failing to declare mistrial where trial court discussed alleged impropriety with the juror and was satisfied that she could remain fair and impartial). Moreover, the comment was not directly related to Samueal's case, and no other jurors expressed an issue with the comment. While Samueal contends that the trial court erred by not conducting a full voir dire of the entire jury, he has presented no caselaw to support this proposition. In fact, he opposed further inquiry of the issue at the trial court.

**{¶23}** For these reasons, there was no error, much less an obvious error, in the proceedings. Samueal has not demonstrated a reasonable probability that but for the juror's comment and the trial court's failure to conduct a full voir dire of the entire jury, the result of the trial would have been different. *See Bailey,* Slip Opinion No. 2022-Ohio-4407, at ¶ 8. The first assignment of error is overruled.

### III. Jury Instructions

**{¶24}** In his second assignment of error, Samueal contends that the court erred when it failed to provide a credibility instruction related to expert testimony. The state asserts that the general credibility instruction given to the jury adequately instructed the jury on credibility.

8

{¶25} Samueal acknowledges that this issue was not raised in the trial court and thus is also subject to plain-error review. *See State v. Owens,* 162 Ohio St.3d 596, 2020-Ohio-4616, 166 N.E.3d 1142, ¶ 7 ("When a defendant fails to object to the jury instructions, she waives all but plain error."); Crim.R. 30(A) ("On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.").

{¶26} We consider the effect of an alleged erroneous jury instruction not in isolation, but viewed in context with the overall charge. *State v. Harrison*, 2015-Ohio-1419, 31 N.E.3d 220, ¶ 71 (3d Dist.); *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus.

{¶27} In *Harrison*, just like this case, the trial court instructed the jury only on witness credibility generally, despite the director of a crime lab providing expert testimony. *Harrison* at ¶ 68. The appellant did not object in the trial court, nor did he articulate how the result of the trial would have been any different with the expert instruction. *Id.* at ¶ 71. The appellate court held that "it was not error, let alone plain error, for the trial court to not instruct the jury specifically concerning the credibility of expert witnesses." *Id.* The same is true here.

{¶28} In this case, the state's final witness, Emily Weber, a Trace Evidence Examiner at the Hamilton County Coroner's Office, was qualified as an expert witness and provided expert testimony on the presence of gunshot residue. The following day, the parties presented their closing arguments, and the jury was instructed. On credibility, the court instructed the jury as follows:

Credibility. You, the jury, are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence. To weigh evidence you must consider the credibility of each person who testifies. You will apply the tests of truthfulness which you apply in each of your daily lives. These tests include the appearance of each witness upon the witness stand, his or her manner of testifying, the reasonableness of his or her testimony, the opportunity he or she had to see, hear, and to know those things about which he or she testified, his or her accuracy of memory, frankness, or lack of it, intelligence, interests, and bias, if any, together with all the facts and circumstances surrounding the testimony of the witness. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any person who testified. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

{¶29} Samueal insists that the following additional instruction should have been given for the expert testimony:

As with other witnesses, upon you alone rests the duty of deciding what weight should be given to the testimony of the expert. In determining its weight, you may take into consideration his * * * skill, experience, knowledge, veracity, familiarity with the facts of this case, and the usual

10

rules for testing credibility and determining the weight to be given to testimony.

*Ohio Jury Instructions*, CR Section 409.21.

**{¶30}** Samueal has not demonstrated a reasonable probability that but for the trial court's failure to provide the instruction on expert testimony, the result of the trial would have been different. *See Bailey,* Slip Opinion No. 2022-Ohio-4407, at ¶ 8. On the facts of this case, the general instruction on credibility was sufficient to guide the jury on issues of credibility. We overrule the second assignment of error.

### IV. The Evidence

**{¶31}** In his third assignment of error, Samueal argues that the jury's verdict was based on insufficient evidence and runs counter to the manifest weight of the evidence.

**{¶32}** When faced with a sufficiency-of-the-evidence challenge, this court asks "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4. The court's role is to ask "whether the evidence against a defendant, *if believed,* supports the conviction." (Emphasis sic.) *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16.

**{¶33}** A manifest-weight argument on the other hand "challenges the believability of the evidence." *State v. Staley*, 1st Dist. Hamilton Nos. C-200270,

C-200271, and C-200272, 2021-Ohio-3086, ¶ 10. When this court reviews a challenge to the manifest weight of the evidence, it must "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 1st Dist. Hamilton No. C-190508, 2020-Ohio-4283, ¶ 16, citing *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶34}** Samueal's primary sufficiency-of-the-evidence argument is that no witnesses saw him shoot Williams. However, the state presented a significant amount of circumstantial evidence that was more than sufficient to establish that fact. The Ohio Supreme Court has consistently held that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value" and "[i]n some instances certain facts can only be established by circumstantial evidence." *Jenks* at 272.

**{¶35}** The evidence in this case, if believed, thoroughly supports the conviction. No contrary evidence was presented to refute Samueal's presence at the Event Center that evening, which was established by Gaither's identification of his voice. In addition to Gaither's identification of Samueal's voice, Gaither's description of the person at the scene matched the description provided by both Jahlen and Vicki Price. While Samueal's DNA was not found on the jacket itself, gunshot residue was identified on the sleeves of the jacket, and Samueal's DNA was identified on other distinctive clothing seen on the shooter, including the black skullcap and the black pants. Moreover, Price's testimony established that Samueal had a firearm that night.

**{¶36}** Regarding the manifest weight of the evidence, Samueal argues that even if the evidence is to be believed, the lack of eyewitnesses and the gaps in the state's evidence cast doubt on his convictions. He also speculates that an unrelated

12

investigation at the Event Center could have motivated another individual to shoot Williams. However, defense counsel presented that theory to the jury several times throughout the trial—during the cross-examination of witnesses and in closing argument. The jury was "free to accept or reject any and all of the evidence offered by the parties * * *." *State v. Gasper*, 1st Dist. Hamilton No. C-220218, 2023-Ohio-1500, ¶ 75. And while Price's testimony had a few inconsistencies compared to the statement he gave police, " 'such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *Id.,* quoting *State v. Fether*, 5th Dist. Stark No. 2011-CA-00148, 2012-Ohio-892, ¶ 44, quoting *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 2000 Ohio App. LEXIS 1138, 10 (Mar. 23, 2000).

{¶37} The third assignment of error is overruled.

### V. The Sentence

{¶38} Finally, Samueal contends that the court erred in its judgment entry by imposing a sentence for his murder conviction that was inconsistent with the sentence announced at the sentencing hearing. The state concedes the error and agrees that the judgment entry should be corrected.

{¶39} The total aggregate sentence in the sentencing entry mirrors the total aggregate sentence pronounced in open court: 21 years to life. However, the judgment entry does not reflect the sentence pronounced in open court for the murder conviction. At the sentencing hearing, the court imposed 15 years to life for the murder conviction pursuant to R.C. 2903.02(B)(1). But, the judgment entry states that the sentence for the murder conviction is 15 years to 22 years, 6 months.

{¶40} Crim.R. 36 provides that "[c]lerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission,

13

may be corrected by the court at any time." "A nunc pro tunc entry may be used to correct a sentencing order, as long as the nunc pro tunc entry reflects what the court actually did, and is not an attempt to modify the court's judgment." *State v. Houston*, 1st Dist. Hamilton No. C-130429, 2014-Ohio-3111, ¶ 42, citing *State v. Breedlove*, 46 Ohio App.3d 78, 81, 546 N.E.2d 420 (1st Dist.1988).

{¶41} Here, the record clearly demonstrates the court intended to impose the sentence of 15 years to life for the murder conviction. The court stated that the sentence for the murder conviction was to be served consecutively to the three-year sentence for the firearm specification, and that the sentence for the weapons-under-disability conviction was also to be served consecutively, totaling 21 years to life. The aggregate term of 21 years to life provided in the judgment entry reaffirms that the sentence for the murder conviction under count one in the judgment entry was a clerical error.

{¶42} Thus, we sustain the fourth assignment of error, and remand the cause for the limited purpose of correcting this error with a nunc pro tunc judgment entry.

### VI. Conclusion

{¶43} In light of the foregoing analysis, we overrule the first, second, and third assignments of error, but sustain the fourth. Accordingly, we affirm the trial court's judgment, but remand for the trial court to issue a nunc pro tunc judgment entry correcting the sentencing error with regard to count one.

Judgment affirmed and cause remanded.

**WINKLER** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

14