DECISION. *Page 2 
{¶ 1} David Crawford and William Wilson were acquaintances — they traveled with the same circle of friends. In late September 2004, Crawford and Wilson took a ride in Wilson's car, a black Mercedes. Although Crawford's story about why they took a car ride and what happened in the car changed between the time he first spoke with police and the time he testified, it is undisputed that Crawford shot and killed Wilson and left his body on a street in the Oakley section of Cincinnati.
 {¶ 2} Crawford was convicted of aggravated murder, murder, and tampering with evidence. He was sentenced to a total of 28 years to life in prison. We affirm both the findings of guilt and the sentences.
 I. State Witnesses — Crawford's "Friends" {¶ 3} Jeff Schulkers was a close friend of Wilson and an acquaintance of Crawford. He testified that he and Wilson had been partying with some girls on the night of the murder, at a hotel about a five-to ten-minute drive from the spot where Wilson's body was found. Wilson got a call on his cellular phone and left the hotel at around 9 p.m. Schulkers spoke with Wilson again on the phone at about 10:30 p.m. Between 10:45 and 11 p.m., Schulkers saw Wilson in the front passenger seat of the Mercedes as it exited from I-75 into Roselawn, going west toward Hartwell. Schulkers did not see the driver. Schulkers spoke with Wilson right after he had seen him in the car, but Wilson did not answer any of several other calls that Schulkers made to Wilson that night.
 {¶ 4} Donald Paul testified that Crawford had called him at around 1 a.m. to ask for a ride home from the White Castle restaurant on W. H. Taft Road, which was a little over a block from where the Mercedes was found. *Page 3 
 {¶ 5} Bill Maglecic was Crawford's landlord and distant relative. He testified that Crawford had given him a Glock 9-mm gun for him to sell in lieu of rent money (Maglecic had a potential buyer). About a week later, Crawford asked for the gun back, purportedly to go shooting on a farm with his cousin and to clean it. A few days later, Crawford returned the gun and told Maglecic that the gun was too much trouble for him, that he did not want to see the gun again, and to "get rid of it."
 {¶ 6} DJ Wittekind was a close friend of Crawford's. He testified that he had witnessed an argument between Crawford and Wilson at a bar, and that afterwards both men had appeared very upset. Wittekind heard Crawford say that he would "take care of the incident" and "do [Wilson] dirty." Prior to the murder, Wittekind met Crawford at Target World, a shooting range. Crawford and Wittekind shot each other's guns. While there, Wittekind showed Crawford how to disassemble his Glock and clean it. After Wilson's murder, Wittekind overheard Crawford telling another friend that he had "done someone dirty." Wittekind, worried that his fingerprints might have been on the murder weapon, told a police officer what he knew.
 {¶ 7} Adam Giles was a close friend of Crawford's. He testified that, before the murder, Crawford had told him on two occasions that he was going to kill Wilson. And on the same day that Crawford told Giles the second time that he planned to kill Wilson, Crawford had asked Giles if he could put a car in his driveway with a cover over it.
 {¶ 8} The night of the murder, Giles said, he had received five to ten calls from Crawford between 11 p.m. and 4:30 a.m — Giles did not answer the phone. About three weeks after the murder, Crawford approached Giles and told him that he had been driving the Mercedes the night of the murder, that he had told Wilson to look to his right, and that he had then shot him. Further, Crawford told Giles that Wilson had wrestled with Crawford, and that Crawford had then pushed him forward and shot him *Page 4 
again. Giles said that Crawford attempted to draw him into other conversations about the murder, but Giles rebuffed his attempts. He also testified that Crawford had told him that he had sold the murder weapon, the Glock, to his landlord.
 {¶ 9} Giles testified that, in November 2004, Crawford had threatened to kill him, so he called Crimestoppers and told them about Wilson's murder. Giles had retained an attorney in an effort to avoid testifying against Crawford at trial.
 {¶ 10} Brian Luken was a close friend of Crawford's. He testified that, in the early morning after the murder, Crawford had showed up at his house in Northern Kentucky in Wilson's Mercedes. He was alone. Crawford asked Luken to follow him somewhere. Luken noticed in the waistband of Crawford's pants a bulge that he thought was a gun. Luken refused to follow Crawford in his car because he had been drinking.
 {¶ 11} The next morning, after hearing that Wilson had been murdered, Luken retained an attorney to "make sure where [he stood]." In subsequent conversations, Crawford described to Luken how he had murdered Wilson — that he had shot him in the face and kicked him out of the car. Luken had to be subpoenaed to testify against Crawford.
 {¶ 12} Sonia Steger was an ex-girlfriend of Crawford's. He was dating her at the same time that he dated a woman named Tara, who had since become his wife. Steger testified that, at Wilson's funeral, Crawford was wearing a shirt with Wilson's photograph on it, and that he later wore dog tags in Wilson's memory. Steger testified that, in one conversation, Crawford had told her that a black man had killed Wilson over a drug deal. Later, Crawford had told her that a Norwood resident and close friend of Wilson's was the killer, and that the killer had attended Wilson's funeral wearing the shirt with Wilson's photograph and memorial dog tags. Crawford also had told Steger that he had told police that he was not involved, and that he had offered a false alibi — he said he would have Tara *Page 5 
(to whom he was not married at the time) lie and say that they were both at home. He also said that Tara was having difficulty getting the story straight. Steger had asked Crawford if he knew how Wilson had been murdered — Crawford told her that Wilson had been shot twice: in the side of the face and in the back of the head.
 {¶ 13} After Steger had found out that Crawford was dating both her and Tara, Steger contacted Tara. The two women discussed the false alibi, and Steger expressed her concern over Tara lying. After that, Crawford began to make harassing and threatening phone calls to Steger. Steger eventually spoke with the police because her friend, who had been Wilson's girlfriend at the time that he was murdered, convinced her to contact the detective investigating the murder.
 {¶ 14} During Steger's cross-examination, Crawford's attorney questioned her about whether Wilson had a reputation for being violent. Although Steger had testified in her deposition that Wilson was a "pretty violent guy," at trial she said that he was only verbally violent with his girlfriend.
 II. State's Other Witnesses {¶ 15} Mike Lenhoff was a firearms expert. He testified that the Glock recovered from Crawford's landlord was not definitively the same gun used to murder Wilson, but that the markings were not inconsistent.
 {¶ 16} Patrick Moran was a police officer who testified about the blood splatter and bullets in the Mercedes. Although Moran had been a criminologist for seven years, had attended a 40-hour blood-splatter course, and had testified about crimes scenes and blood splatter on many occasions over the preceding seven years, he had not been specifically identified as an expert witness. Moran's testimony established that Wilson had been shot in the car while he was seated in the front passenger seat. Crawford's attorney did not cross-examine Moran. *Page 6 
 {¶ 17} Thomas Briscoe had been incarcerated with Crawford. Briscoe had contacted police about 15 to 20 conversations that he had with Crawford in jail about Wilson's murder. He testified that Crawford had told him that Wilson had owed Crawford's relative money and had repeatedly said, "I'm a killer. I'm not soft." He said that Crawford had told him that he planned to have family members in the courtroom to intimidate the witnesses and to have his wife lie to the jury. Crawford had told Briscoe that he was very worried that Luken's testimony could hurt him. Crawford also indicated that if he was "going down, everybody is going down," and he asked Briscoe if he could "reach out and touch" the witnesses.
 {¶ 18} Briscoe testified that Crawford had told him that he was not concerned about the gun because he had ensured that the ballistics would not match up by twisting a metal object into the barrel of the gun. Briscoe also testified that Crawford said that he would blame the crime on Russians or Africans and that no jury would find him guilty because he was white, clean-cut, and in the military.
 {¶ 19} Dr. Robert Pfalzgraf performed Wilson's autopsy. He testified at trial that defensive wounds generally occurred on the hands or arms when a person attempted to block a blow or a gunshot. He found that Wilson had a set of injures on his hands that were consistent with defensive wounds. Wilson's right hand showed evidence of blunt-impact trauma close to the time of death. Furthermore, stippling (where the skin is "burned" from gunpowder) appeared on Wilson's face, but not on a large part of his forehead, which was consistent with a hand covering the face.
 {¶ 20} The state's final witness was Detective John Horn. He testified that he had interviewed Crawford shortly after the murder because investigators knew that Crawford had been with Wilson on the night of the murder. In October 2004, Horn interviewed Crawford. During that interview, Crawford claimed that he had approached *Page 7 
Wilson to buy marijuana, that they had driven to Hamilton, Ohio, and then to Elmwood, Ohio, and that Wilson had dropped him off at home between 11:15 and 11:30 p.m. Crawford was not considered a suspect at that time.
 {¶ 21} After Giles had spoken with Horn, Horn asked Crawford to give fingerprints. He did not tell Crawford about Giles's statement, and he did not indicate to Crawford that he was a suspect. Yet Crawford appeared nervous during this visit — he told Horn that he had heard that he was a suspect.
 {¶ 22} After giving statements to Horn, the various witnesses (Giles, Luken, and Wittekind) had told him that they would not testify against Crawford. The only witness who had agreed to cooperate was Steger. Horn had no further contact with Crawford until 2006.
 {¶ 23} Crawford was a witness in another crime in September 2006. Horn spoke to Crawford again at that time. Horn told Crawford that the police had recovered the Glock, that it was traceable to Crawford, and that there were individuals who had told him that Crawford had murdered Wilson. Crawford told Horn that he was going into the military — Horn replied that it would not absolve him of his sins. Crawford responded that his mother had told him the same thing. Shortly after this conversation, Crawford's case was presented to a grand jury. Crawford was arrested on December 25.
 {¶ 24} The trial court allowed the state to play tapes of phone calls that Crawford had made while he was in jail. Much of the taped conversations involved Crawford telling Tara or others that he was horribly upset about the situation, that he was sorry that Wilson had died, and that he had killed Wilson in self-defense. In other parts of the tapes, Crawford worried about the possible witnesses against him and told a friend that the tampering-with-evidence charge could not stick. *Page 8 
 {¶ 25} The trial court redacted references to a plea agreement that Crawford had first accepted and then rejected. But some vague references to the agreement were left intact: "I will do 15, I will do 14 years standing on my head." "I will ask for early release * * * I'm gonna be in prison for 10 years." "Brian would've been the most hurtful witness I had. Right? And if you're telling me, Brian * * * you're gonna say `Hey look I've gotta say this and this,' I'd have been like, OK, I'm done for, thank you. * * * And maybe I'd have walked out of there with less than 10 years if I'd have known this months ago."
 {¶ 26} During his cross-examination, Horn testified that, besides clothing and jewelry, nothing had been found with Wilson's body other than an identification and one penny. No gun was found at the scene.
 III. Crawford's Witnesses {¶ 27} Josh Meadors testified that he knew both Crawford and Wilson, and that he had never known of a problem between them. Meadors witnessed Wilson crash Crawford's motorcycle and guessed that Wilson had paid Crawford about $1,000 for it.
 {¶ 28} Darryl Love was incarcerated with Crawford and Briscoe. He testified that Briscoe had told him that he wanted to "jump on a case," and that Briscoe had asked Love whether he thought it would be more beneficial to testify against a white defendant or a black defendant. Love also testified that he and Crawford had a falling out just before Love was moved to another location, but that he wanted to testify for Crawford because he thought that Briscoe was lying. (During cross-examination, Love admitted that Briscoe had not told him that he planned to lie during the trial.)
 {¶ 29} Jason Crawford was David Crawford's cousin. Jason was a good friend of Wilson — they had gone on vacations together, and Jason had sold Wilson a car. He generally had spoken to both Crawford and Wilson on a daily basis and did not know of any problems between the two. He testified that Crawford was not angry that Wilson *Page 9 
had crashed his motorcycle because Wilson had paid Crawford for it. He also testified that Wilson was a drug dealer.
 {¶ 30} Crawford testified in his own defense. He said that he had never had an altercation with Wilson prior to the night of Wilson's death. He testified that, about a week before the murder, Wilson had called him to tell him that he had been shot at and robbed of cocaine and money. Wilson asked Crawford to help him find the robber and "do something to him." They drove back to the area where the robbery had taken place, and according to Crawford, Wilson had pulled a gun on someone and "flipped out."
 {¶ 31} Crawford testified that, on the night of the murder, Wilson had wanted to purchase cocaine from him. Wilson picked him up, and the two of them drove to Hamilton to purchase marijuana for Wilson to sell, and they then stopped at a house in Elmwood. Next, they went to Crawford's house to pick up the cocaine — Crawford got the cocaine and went back to the car. At this point, Crawford said, Wilson had asked him to drive so that Wilson could examine the cocaine.
 {¶ 32} Crawford testified that he had told Wilson that he wanted $5,500 for the cocaine, and that Wilson had thought that Crawford was "ripping him off." Crawford said that Wilson told him that he was taking the cocaine anyway. Crawford threatened to tell his cousin Jason that Wilson had wanted to rob him. Crawford told Wilson that Jason would take his car and cut him off from his supply of drugs. Crawford said that Wilson had pulled a gun on him and replied, "Not if I leave you stinking."
 {¶ 33} Crawford said that he was driving the car when Wilson had pulled the gun out and that Wilson had directed him where to drive. Wilson told him to pull over on a dark street, and as he was pulling over, he pulled out his own gun and shot Wilson twice. Crawford said that he believed that if he had not shot Wilson, Wilson would have shot him and left him on the street. Crawford said that he had laid Wilson on the street *Page 10 
and then driven to Luken's house. He said that Luken had put on gloves and picked the shell casings out of the car. He also said that he had given both his own gun and Wilson's gun to Luken.
 {¶ 34} Crawford told the jury during his direct testimony that he had previously pleaded guilty to manslaughter and tampering with evidence, but had withdrawn that plea.
 {¶ 35} After Crawford had withdrawn his guilty plea, he entered a notice of alibi, but later withdrew it. The state questioned Crawford about this on cross-examination.
 {¶ 36} The jury found Crawford guilty of aggravated murder, murder, and tampering with evidence.
 IV. Assignments of Error {¶ 37} On appeal, Crawford presents eight assignments of error: (1) the state failed to present enough evidence to convict Crawford; (2) the conviction was against the manifest weight of the evidence; (3) the trial court failed to order a mistrial after jurors saw Crawford in handcuffs; (4) the trial court improperly admitted prejudicial evidence; (5) Crawford's trial attorney provided ineffective assistance; (6) the trial court allowed expert testimony from a witness who was not qualified as an expert; (7) cumulative error compromised Crawford's right to a fair trial; and (8) Crawford should have been sentenced to minimum concurrent sentences.
 V. Sufficiency and Weight of the Evidence {¶ 38} To determine if a conviction is supported by sufficient evidence, this court views the evidence in a light most favorable to the prosecution and determines whether any rational jury could have found that the essential elements of the offenses *Page 11 
had been proved beyond a reasonable doubt.[1] When reviewing the manifest weight of the evidence, this court uses a different test. We review the record, weigh the evidence, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created a manifest miscarriage of justice.[2]
 {¶ 39} In this case, the state met its burden to produce sufficient evidence for a conviction. Further, the jury did not lose its way and create a manifest miscarriage of justice by finding Crawford guilty.
 {¶ 40} For aggravated murder, the state was required to prove that Crawford had "purposely, and with prior calculation and design, cause[d] the death of"[3] Wilson.
 {¶ 41} There was no dispute that Crawford had caused the death of Wilson. Crawford admitted that he had shot Wilson. The coroner testified that Wilson had died as a result of one of the gunshots.
 {¶ 42} The state presented enough evidence to prove that Crawford had killed Wilson purposely, and with prior calculation and design. Several witnesses testified that Crawford had told them directly or hinted that he had planned to kill Wilson. This was sufficient to show both that he had planned the murder and that he had purposely killed Wilson. And the jury believed these witnesses rather than Crawford. This was not the sort of rare case where the jury's guilty verdict would have created a miscarriage of justice.
 {¶ 43} Crawford claimed that he had killed Wilson in self-defense. While the state had the burden of proving beyond a reasonable doubt that Crawford had killed Wilson purposely, with prior calculation and design, self-defense is an affirmative defense, so the burden shifted to Crawford.[4] He had the burden of proving, by a preponderance of the evidence, that he (1) was not at fault in creating the situation; (2) *Page 12 
genuinely believed that he was in imminent danger of death or bodily harm, and that the only way to avoid the danger was to shoot Wilson; and (3) did not violate a duty to retreat or avoid the danger.
 {¶ 44} The jury did not believe Crawford's testimony that Wilson had pulled a gun on him and that he was forced to kill Wilson to save his own life. And after reviewing the entire transcript of the trial, we cannot say that the jury lost its way. Crawford had told various individuals that he had planned to kill Wilson. Their combined testimony was more credible than Crawford's. Moreover, no evidence ever surfaced to show that Wilson even had a gun on the night of the murder. Wilson had wounds on his hands that were consistent with defensive wounds. The stippling on his hands and head suggested that he had put his hands to his face before he was shot — this was hardly an action that a man holding his own gun would have taken. Crawford failed to prove that the murder was in self-defense by a preponderance of the evidence.
 {¶ 45} To prove that Crawford had tampered with evidence, the state had to show beyond a reasonable doubt that Crawford, knowing that an investigation was either in process or likely to be instituted, had "alter[ed], destroyed], conceal[ed], or remove[d] any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."[5]
 {¶ 46} Crawford's landlord testified that Crawford had given him the gun to sell, had asked for it back, and then had told him to get rid of it. Briscoe testified that Crawford had told him that he altered the gun so that the ballistics would not match. But Crawford testified that he gave his gun to Luken.
 {¶ 47} Even if the jury chose to believe Crawford, his actions clearly constituted tampering with evidence. He was either concealing or removing the gun with the *Page 13 
purpose of impairing its availability as evidence. By his own testimony, he was guilty of tampering with evidence beyond a reasonable doubt.
 {¶ 48} Because the state presented sufficient evidence to prove both aggravated murder and tampering with evidence, and because the jury did not lose its way and create a manifest injustice, we overrule Crawford's first two assignments of error.
 VI. View of Crawford in Handcuffs Did not Necessitate a Mistrial {¶ 49} Crawford asserts that because several jurors saw him in the hallway outside the courtroom wearing handcuffs and accompanied by a police officer, the trial court should have declared a mistrial. Crawford failed to object to how the trial court handled the situation. He did not move for a mistrial. Thus, we review this assignment of error for plain error only.
 {¶ 50} The decision to grant a mistrial rests with the trial court and is reviewed by this court for an abuse of discretion.[6] An abuse of discretion is not just an error in judgment — it involves an unreasonable, or arbitrary, or unconscionable decision by the trial court[7] Unreasonable means a product of unsound reasoning.[8]
 {¶ 51} The trial court did not abuse its discretion by failing to sua sponte declare a mistrial. And even if Crawford had moved for a mistrial, the result would have been the same. The trial court individually questioned the jurors who saw Crawford in handcuffs to ensure that the brief, inadvertent sighting would not prejudice them. The trial court was in the best position to monitor whether the sighting would cause the jurors to be prejudiced. Nothing in the record leads us to conclude that there was an abuse of discretion. This assignment of error is overruled. *Page 14 
 VII. Evidence {¶ 52} Relevant evidence is any evidence that tends to make a material fact more or less probable.[9] All relevant evidence is admissible, unless it is inadmissible because of another rule or law.[10] But even relevant evidence is not admissible if the danger of unfair prejudice outweighs the probative value of the evidence.[11]
 {¶ 53} Concerning relevancy, "the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice."[12]
 {¶ 54} Crawford argues in his fourth assignment of error that the trial court improperly admitted evidence of Crawford's jail tapes, the gun, and his withdrawn alibi. We address each individually.
 {¶ 55} Crawford contends that because the gun was not used in the murder, it was improperly admitted into evidence. But the evidence strongly suggested that this gun was used to murder Wilson: Crawford took it back from his landlord, practiced shooting the gun at a shooting range, and then after the murder gave it back to his landlord, telling him to get rid of it. The trial court did not abuse its discretion by admitting the gun into evidence. Furthermore, Crawford admitted that he had shot Wilson. The admission of a gun, even if it was not the gun used in the murder, would not have materially prejudice Crawford.
 {¶ 56} The jailhouse tapes did not unfairly prejudice Crawford, nor did they violate the prohibition against revealing prior plea negotiations. The probative value of the tapes far outweighed any danger of prejudice to Crawford. *Page 15 
 {¶ 57} And the tapes would not have led the jury to assume that Crawford had entered into a plea agreement. The only statement that might have led a juror to wonder if there were plea negotiations prior to trial was the following: "Brian would've been the most hurtful witness I had. Right? And if you're telling me, Brian * * * you're gonna say `Hey look I've gotta say this and this,' I'd have been like, OK, I'm done for, thank you. * * * And maybe I'd have walked out of there with less than 10 years if I'd have known this months ago." Although this statement may have led a juror to wonder about a plea agreement, we cannot say that the trial court abused its discretion in admitting the statement. If it was an error to admit this statement, it was harmless error. There was a plethora of other evidence that convinced the jurors that Crawford had planned and carried out Wilson's murder, without having acted in self-defense. (We note that Crawford, in his direct testimony, told the jury himself that he had previously reached a plea agreement.)
 {¶ 58} Many of the statements Crawford made on the tapes were actually exculpatory — Crawford repeatedly told the person with whom he was speaking that he had killed Wilson in self-defense and that he was in anguish because of it.
 {¶ 59} Finally, Crawford argues that the court erred by allowing in evidence that Crawford had previously entered a notice of alibi. This evidence was relevant — it tended to show that Crawford was dishonest. And specific instances of conduct may be used to attack a witness's character for truthfulness on cross-examination.[13]
 {¶ 60} The trial court did not abuse its discretion by admitting evidence of the gun, the jailhouse tapes, and the alibi. *Page 16 
 VIII. Expert Testimony without a Daubert Hearing {¶ 61} Crawford argues that the trial court erred by allowing expert testimony from Criminologist Moran, who was not qualified as an expert, without a Daubert hearing.[14] Considering the totality of the circumstances, we determine that the trial court did not err by allowing Moran to testify about blood splatter.
 {¶ 62} Criminologist Moran testified that he had examined the Mercedes for fingerprints, bullet holes, and blood splatter. In short, he determined that Wilson had been sitting in the front passenger seat of the Mercedes when he was shot, and that the person who had killed him was on Wilson's left side.
 {¶ 63} Crawford argued at trial and insists on appeal that the trial court should have held a Daubert hearing to establish whether Moran was an expert on blood splatter. Evid. R. 702 would have allowed Moran to testify as an expert if (a) his testimony related to subjects that lay people were not familiar with; (b) Moran was qualified as an expert by specialized knowledge, skill, experience, training, or education about blood splatter; and (c) Moran's testimony was based on reliable scientific, technical, or other specialized information.
 {¶ 64} Blood-splatter patterns involve a subject that lay people are not knowledgeable about. Moran had been a criminologist for seven years, had routinely examined and analyzed blood-splatter patterns, and had received both on-the-job and formal training. His testimony was based upon specialized information. The trial court did not err by allowing him to testify as an expert without a Daubert hearing.
 {¶ 65} Furthermore, even if it was erroneous to allow Moran to testify, it would not have constituted reversible error. Moran's testimony only established that Wilson was shot while sitting in the front passenger seat. Crawford admitted on direct *Page 17 
examination that he had shot Wilson while he sat in the front passenger seat of the car. Thus Moran's testimony added nothing to affect the outcome of the case.
 IX. Ineffective Assistance {¶ 66} Crawford alleges that his trial attorneys provided ineffective assistance of counsel. Not so. To reverse on this ground, Crawford would have to show both that his attorneys' performance was deficient, and that but for the deficient performance, there was a reasonable probability that the jury would have found him not guilty.[15]
Crawford cannot get past the first part of this test. His attorneys were highly competent and made the most of the facts that they were forced to deal with.
 {¶ 67} Crawford specifically points to his attorneys' failure to cross-examine Moran and two other police officers. The other two officers' testimony had no more effect on the outcome of the trial than did Moran's testimony — they only testified about how they had responded to the scene and collected evidence.
 {¶ 68} A defendant cannot succeed on an ineffective-assistance-of-counsel claim over a disagreement about trial strategy.[16] Crawford admitted at trial that he had shot Wilson. The only thing for the jury to decide was whether Crawford had shot Wilson in self-defense. The three police officers' testimony added nothing of significance to the case; cross-examining them would not have made a whit of difference to the outcome.
 X. No Cumulative Error {¶ 69} Crawford argues that cumulative error deprived him of a fair trial. Specifically, he argues that the trial court erred by (1) using notes instead of transcripts to *Page 18 
check for inconsistencies in prior testimony; (2) not ordering the sheriff to allow Crawford to change clothing from day to day; (3) admitting cumulative, gory photographs; (4) allowing the state's discovery response to be an exhibit; (5) having in the courtroom during opening statements an officer who later testified; and (6) allowing the prosecutor to make a trigger hand and then to make "firing" motions toward defense counsel.
 {¶ 70} We have reviewed every word of the transcript of the trial. Crawford received a fair trial. None of these incidents individually or cumulatively are enough to order a reversal.
 XI. Concurrent Sentences not Mandatory {¶ 71} Crawford argues that because he had never been convicted of a felony, he should have been sentenced to the statutory minimum for each offense, with concurrent terms. Not so. Following State v.Foster, [17] a trial court has discretion to sentence a defendant to any amount of time allowed by statute. Crawford's sentences were within the statutory range.
 {¶ 72} For the foregoing reasons, we affirm the judgment of the trial court.
Judgment affirmed.
HENDON and CUNNINGHAM, JJ., concur.
[1] State v. Traore, 1st Dist. No. C-060802, 2007-Ohio-6334, at ¶ 12.
[2] Id.
[3] R.C. 2903.01(A).
[4] State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 73.
[5] R.C. 2921.12.
[6] State v. Ahmed, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 92.
[7] State v. Person, 174 Ohio App.3d 287, 2007-Ohio-6869,881 N.E.2d 924, at ¶ 12.
[8] State v. Echols (1998), 128 Ohio App. 3d 677, 699,716 N.E.2d 728.
[9] Evid. R. 401.
[10] Evid. R. 402.
[11] Evid. R. 403.
[12] State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815,848 N.E.2d 810, at ¶ 62.
[13] Evid. R. 608(B).
[14] Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993),509 U.S. 579, 113 S.Ct. 2786.
[15] Strickland v. Washington (1984), 466 U.S. 668, 694,104 S.Ct. 2052.
[16] State v. Brown, 115 Ohio St.3d 5, 2007-Ohio-4837, 873 N.E.2d 858, at ¶ 53.
[17] 109 Ohio St.3d 1, 2006-Ohio-856, 854 N.E.2d 470. *Page 1